EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Dolores Colón<br><br>Demandantes–Recurridos<br><br>v.<br><br>Glamorous Nails & Boutique, Inc., Marta Larissa Alvarado de Silverio, et. als.<br><br>Demandados–Recurrentes | Certiorari<br><br>2006 TSPR 16<br><br>166 DPR \_\_\_\_ |
|---|---|

Número del Caso: CC-2004-275

Fecha: 3 de febrero de 2006

Tribunal de Apelaciones:

       Región Judicial de Bayamón

Juez Ponente:
       Hon. Nydia Cotto Vives

Abogado de la Parte Recurrente:

       Lcdo. Ramón L. WalKer Merino

Abogado de la Parte Recurrida:

       Lcdo. Rafael Román Jiménez


Materia: Incumplimiento de Contrato


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Dolores Colón

Demandantes-Recurridos

v.

CC-2004-275     CERTIORARI

Glamorous Nails & Boutique, Inc., Marta Larissa Alvarado de Silverio, et. als.

Demandados-Recurrentes


Opinión del Tribunal emitida por la Jueza Asociada SEÑORA FIOL MATTA


San Juan, Puerto Rico, a 3 de febrero de 2006.

La co-demandada recurrente, Marta Larissa Alvarado de Silverio, nos solicita que revoquemos la sentencia del Tribunal de Apelaciones fechada 30 de enero de 2004, que confirmó al Tribunal de Primera Instancia, respecto a la existencia de daños bajo la doctrina culpa *in contrahendo*. Examinado el expediente apelativo y el derecho aplicable y por las razones que habremos de exponer, modificamos la sentencia recurrida y así modificada, se confirma.


I.

Los hechos medulares del presente recurso se resumen a continuación. En el mes de enero de 2000, la Sra. Marta Larissa Alvarado, Presidenta de

Glamorous Nails & Boutique, Inc.,[1] se comunicó telefónicamente con la Sra. Dolores Colón[2] para informarle que tenía planificado vender su negocio de arreglo de uñas y le preguntó si le interesaba comprarlo. En esta misma conversación telefónica la señora Alvarado le comunicó a la señora Colón que el precio de compraventa era de $350,000. La señora Colón manifestó interés en adquirir el negocio y se comprometió a consultarlo con su esposo, el Sr. Fidencio Aldamuy. Posteriormente, la señora Colón se comunicó con la señora Alvarado para reiterarle su interés en comprar el negocio y solicitó una reunión a los fines de comenzar el proceso de negociación.

Así las cosas, en o alrededor del mes de marzo de 2000, la señora Alvarado nuevamente le ofreció a la señora Colón venderle todos los activos de Glamorous Nails & Boutique, Inc. por el precio de $350,000.00. Se reunieron entonces para discutir la oferta. El Sr. Rafael Silverio, esposo de la señora Alvarado participó en esa reunión. Entre otras cosas, la señora Colón indagó sobre la disposición de los esposos a financiar parte del precio de compraventa.

Para el mes de febrero o marzo de 2000, la señora Colón contrató a la Contadora Pública Autorizada ("C.P.A.") Carmen Román para que la orientara en cuanto a la conveniencia de realizar el negocio y los planes para materializar el mismo. La C.P.A. Román le indicó a la

---

[1] Glamorous Nails & Boutique, Inc., es una corporación creada bajo las leyes del Estado Libre Asociado de Puerto Rico, en la cual se proveen servicios para el cuidado de uñas.

[2] La señora Colón fue cliente de Glamorous Nails & Boutique, Inc. por espacio de 15 años y conocía a la Sra. Marta Larissa Alvarado desde entonces.

señora Colón que para ello necesitaba cierta información, a saber: el volumen de ventas del negocio, los seguros que poseía y los gastos. La señora Colón solicitó la información y la señora Alvarado le entregó el libro de apuntes relacionados con las ventas diarias del negocio, que incluía, además de las ventas diarias, el resumen mensual y anual de esas ventas y el pago a las empleadas y técnicas de Glamorous Nails & Boutique, Inc. La señora Colón retuvo el libro por varios días antes de devolvérselo a la persona encargada de entrar la información en el libro, la Sra. Carmen Muñoz de Alvarado.[3]

En el mes de marzo de 2000 se reunieron la señora Colón, el señor Silverio, la señora Alvarado y la C.P.A. Román. En esa reunión se discutió el precio de compraventa, el número de empleados del negocio, el canon de arrendamiento, el pietaje del negocio, el nombre del agente de seguros y las razones para la venta.Después de la reunión, la C.P.A. Román preparó unas proyecciones de flujo de efectivo del negocio desde el 2001 al 2010 y un "Schedule of operation & cash flow" desde el año 1996 al 1999. Estos documentos se prepararon a base de la información contenida en el libro de ventas diarias del negocio, así como información provista por la señora Alvarado y la Sra. Carmen Muñoz de Alvarado.

La señora Colón llevó a cabo otras gestiones, entre ellas las siguientes: solicitó información sobre el financiamiento en Eurobank, pero no llenó la solicitud

---

[3] La señora Muñoz de Alvarado es la madre de la Sra. Marta Larissa Alvarado y una de las accionistas de Glamorous Nails & Boutique, Inc.

requerida; obtuvo información del "Small Business Administration"; acudió al Sr. Rafael Rivera de la compañía Consultech, para asesorarse sobre el financiamiento de la transacción y contrató los servicios del Lcdo. Rafael Román Jiménez a los fines de crear una corporación.[4]

A finales del mes de mayo o principios del mes de junio de 2000, la señora Colón se reunió con la señora Alvarado. Esta fue la última reunión que se realizó durante el proceso de negociación y sólo asistieron la señora Colón y la señora Alvarado. En esta reunión, la señora Colón le solicitó a la señora Alvarado más información sobre el negocio, específicamente con relación a las empleadas, el inventario y las deudas. También le informó a la señora Alvarado que iba a solicitar un préstamo a la "Small Business Administration".[5]

Ahora bien, las partes no acordaron la forma de pago del precio de compraventa ni se hizo pago alguno por ese concepto. La señora Alvarado alega que por esa razón entendió que el negocio no era seguro y una semana después de la reunión, le comunicó a la señora Colón que se había arrepentido de vender Glamorous Nails & Boutique, Inc. Surge de la transcripción de la prueba que la señora Alvarado reconoció que la señora Colón aceptó su oferta de venta y que ella (la vendedora) le dijo "está bien, no hay

---

[4] Los demandantes no presentaron evidencia, durante la vista en su fondo, de que se hubiera organizado una corporación para adquirir los activos de Glamorous Nails & Boutique, Inc.

[5] Del expediente apelativo surge que los demandantes nunca sometieron los documentos a Eurobank ni a la "Small Business Administration" para solicitar el financiamiento para la compraventa.

problema", aunque dicha expresión en su fuero interno "no significó nada para mi". En su sentencia, el Tribunal de Primera Instancia recoge este incidente en su determinación de hechos núm. 26. Ante las recriminaciones de la señora Colón sobre el tiempo y dinero que ella había invertido durante las negociaciones, la señora Alvarado se comprometió a reembolsarle los gastos y darle un año gratis de servicio en Glamorous Nails & Boutique, Inc.

Así las cosas, la señora Colón le envió las facturas de los gastos y la señora Alvarado, a través de su abogado, se negó a reembolsarlos por encontrarlos excesivos.[6] El 24 de octubre de 2000, la señora Colón instó demanda sobre incumplimiento de contrato y daños y perjuicios contra Glamorous Nails & Boutique, Inc., Marta Larissa Alvarado de Silverio, su esposo Rafael Silverio y la sociedad de bienes gananciales compuesta por ambos y Carmen Muñoz de Alvarado, su esposo Héctor M. Alvarado y la sociedad legal de bienes gananciales compuesta por ambos.

Durante la vista celebrada los días 27 y 28 de septiembre de 2001, la señora Alvarado expresó, entre otras cosas, que una de las razones para desistir de vender su negocio fue que no tomó en serio las negociaciones porque la señora Colón no había solicitado el financiamiento a ninguna institución bancaria, a pesar de que habían transcurrido de cinco a seis meses desde el ofrecimiento de venta. Otra razón por la cual se había

---

[6] En la factura aparecían las cantidades de $4,200.00 de honorarios a la C.P.A. Carmen Román, y $4,200.00 de honorarios al licenciado Román.

arrepentido de vender era que se había enterado que la transacción tendría un impacto contributivo sustancial.[7]

El 8 de octubre de 2001, el Tribunal de Primera Instancia dictó sentencia resolviendo que no procedía ordenar el cumplimiento específico del contrato ni la imposición de daños porque realmente no hubo entre las partes un acuerdo de voluntades que generara un contrato. Entendió el foro de instancia que no existió una declaración completa y clara del oferente. No obstante, luego de citar la jurisprudencia normativa pertinente a la doctrina de culpa *in contrahendo*, el tribunal razonó que procedía imponerle responsabilidad a la co-demandada Alvarado y la sociedad de bienes gananciales compuesta por ella y el Sr. Rafael Silverio "por el rompimiento negligente, injustificado y doloso de las negociaciones". En ese contexto, el foro de instancia ordenó a la co-demandada Alvarado a pagar $8,400.00 por los gastos incurridos por la señora Colón, y $10,000.00 por daños emocionales, más las costas del litigio y honorarios de abogado.

Inconforme con este dictamen, la señora Alvarado recurrió al Tribunal de Apelaciones y el 30 de enero de 2004 ese foro confirmó la sentencia apelada. Aunque el foro apelativo revocó algunas de las conclusiones de derecho del foro de instancia, éstas no afectaron la determinación de confirmar el dictamen apelado.[8]

---

[7]    Informó que la cantidad que hubiese tenido que pagar al Departamento de Hacienda por concepto de contribuciones resultaba onerosa, sin precisar la cantidad exacta.

[8]    El Tribunal de Apelaciones tuvo ante sí una transcripción de la vista en su fondo y una exposición narrativa del testimonio de la Sra. Marta Larissa

Nuevamente inconforme con la sentencia emitida por el foro apelativo, la señora Alvarado recurre ante este Tribunal, vía recurso de *certiorari* presentado el 5 de abril de 2004. Aduce que el foro apelativo erró al "avalar la conclusión del Tribunal de Primera Instancia de que la retirada de las negociaciones por razón del impacto contributivo que la venta del negocio representaba constituye [*sic*] culpa *in contrahendo*", al aceptar la determinación del foro de instancia de conceder daños emocionales y al conceder la partida de gastos sin que éstos se hubieran demostrado por prueba fehaciente. Examinado el recurso, expedimos el auto. La señora Colón no compareció, no obstante nuestra orden concediéndole término para presentar alegato, por lo que dimos por sometido el recurso, sin el beneficio de su comparecencia, el 7 de febrero de 2005.

Está ante nuestra consideración, primeramente, si los hechos probados constituyen base suficiente para aplicar la doctrina de culpa *in contrahendo*. Si la respuesta es afirmativa, debemos resolver si procede compensar los daños alegados, en particular los que se refieren a sufrimientos y angustias mentales. Examinado el expediente apelativo y el derecho aplicable resolvemos.

II.

Es principio básico del derecho de obligaciones que nadie está obligado a contratar. J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1978, T. II, Vol. I, pág. 226. Prods. Tommy Muñiz v. COPAN, 113

---

Alvarado, ya que porciones de la grabación original se habían dañado.

DPR 517 (1982), en la pág. 526. Esto "tiene como consecuencia que las partes no se encuentren obligadas a proseguir con las negociaciones hasta perfeccionar el contrato, sino que están en libertad de contraer el vínculo o retirarse, según convenga a sus mejores intereses." Prods. Tommy Muñiz v. COPAN, supra, citando a Albaladejo, *Derecho Civil*, 2da ed., T.I, pág. 317.

No obstante, aun cuando no se hubiera perfeccionado un contrato, nuestro ordenamiento reconoce que "[l]as negociaciones preliminares generan **una relación de carácter social** que impone a las partes el deber de comportarse de acuerdo con la buena fe, que no impera solamente en las relaciones jurídicas ya establecidas o constituidas, sino también en las relaciones derivadas de un simple contrato social." Prods. Tommy Muñiz v. COPAN, supra, en las págs. 526 a 527 citando a Díez Picazo en *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. I, en la pág. 191 (énfasis nuestro).[9] En palabras de Puig Brutau, esta relación "impone determinados deberes, en el sentido de estar las partes obligadas a comportarse con la buena fe necesaria y a observar la lealtad exigida por las convicciones éticas imperantes." J. Puig Brutau, supra, en la pág. 227. Se

---

[9] La doctrina conoce esta etapa precontractual como la de los "tratos preliminares." Manuel Albaladejo, Tratado de Derecho Civil, Barcelona, Ed. Bosch, T. II, Vol. I, (1989) pág. 226, define éstos como sigue: "Hay tratos previos cuando a la emisión de la oferta precede un período de tanteos preliminares, en los que ambas partes o una de ellas (pues basta que la intervención de la otra se limite a apreciar lo que somete a su consideración aquélla) hacen cálculos y valoran posibilidades, para señalar los eventuales términos en los que cabría o convendría concluir el contrato; pero sin proponer en firme una a la otra su conclusión en tales o cuales condiciones definitivamente determinadas."

trata, como señala Moreno Quesada, citando al jurista alemán Ihering,[10] de un **deber de diligencia** que surge del comienzo voluntario de "una actividad que le pone en relación directa, con el círculo de intereses de otro". Moreno Quesada, *supra*, en la pág. 200. (Énfasis nuestro). Esto sujeta a las reglas de la culpa al que pone fin a la interacción de forma intempestiva.

En su tratado titulado "La Doctrina de los Actos Propios", Díez Picazo señala que:

> La buena fe, en el sentido que aquí importa, es la lealtad en el tratar, el proceder honrado y leal. Supone el **guardar la fidelidad a la palabra dada y no defraudar la confianza, ni abusar de ella**; supone un conducirse como cabe esperar de cuantos, con pensamiento honrado, intervienen en el tráfico como contratantes. Lo que se aspira a conseguir, se ha dicho, es que el desenvolvimiento de las relaciones jurídicas, el ejercicio de los derechos y el cumplimiento de las obligaciones, se produzca conforme a una serie de principios que la conciencia jurídica considera necesarios, aunque no hayan sido formulados. Díez Picazo, *La Doctrina de los Actos Propios*, Barcelona, 1963, en la pág. 157. (Énfasis nuestro).

En <u>Prods. Tommy Muñiz v. COPAN</u>, supra, resolvimos que la responsabilidad que genera el incumplimiento con el deber de actuar de buena fe durante las negociaciones es de naturaleza extracontractual. Se asienta esta responsabilidad en que la suspensión injustificada de las negociaciones "constituye un quebrantamiento de la buena fe que... penetra todo nuestro ordenamiento positivo... que le impone a las partes un deber de lealtad recíproca

---

[10] Von Ihering, *De la culpa in contrahendo*, en Oeuvres choisies. II ed. Francesa, París, 1893, núm. 15, pág. 4.

en las negociaciones".[11] <u>Prods. Tommy Muñiz v. COPAN</u>, supra, en la pág. 528.

Hemos reconocido la culpa *in contrahendo* no sólo cuando una de las partes que interviene en el proceso de formación de un contrato actúa intencionalmente, mediando dolo, fraude o abuso del derecho, sino también cuando obra negligentemente, causando daño. <u>Prods. Tommy Muñiz v. COPAN</u>, supra. Además, como señala Moreno Quesada, "la actuación culposa o negligente que provoca la responsabilidad, tanto puede ser positiva, consistir en una actuación del sujeto, como tener un contenido negativo, traducirse en una **omisión.**" Moreno Quesada, supra, en la pág. 208, énfasis nuestro.[12] El Código alemán, que regula la culpa *in contrahendo*, define la negligencia que da lugar a ésta como "la falta de diligencia exigible en el tráfico". Clara I. Asúa González, La Culpa *in*

---

[11] "Una razón elemental de equidad aconseja sean protegidas las actuaciones de buena fe frente a la conducta culpable que les produzca una consecuencia dañosa, y ello tanto si se ocasiona con motivo de la ejecución de relaciones previamente trabadas (culpa contractual), como si es en la preparación de las mismas (culpa in contrahendo)...". Moreno Quesada, B., *La Oferta de Contrato*, Barcelona, Colección Nereo, 1963, pág. 200. Véase, <u>Velilla v. Pueblo Supermarkets</u>, 111 DPR 585 (1981), en la pág. 588: "El contenido de eticidad de cada acto deberá examinarse a la luz de sus circunstancias particulares, pero el comportamiento conforme a la buena fe es precepto general que abarca toda actividad jurídica". Además, <u>Catalytic Ind. Saint. Co. v. F.S.E.</u>, 121 DPR 98 (1988), en la pág. 113; <u>Ramírez v. Club Cala de Palmas</u>, 123 DPR 339 (1989), en la pág. 346. Entenza Escobar, *La Responsabilidad Precontractual en Derecho Puertorriqueño*, 7 Rev. Der. Puertorriqueño 105 (1963).

[12] Evidentemente,"... el lógico deseo de mantener una esfera de libertad para que las partes negocien no puede llevar a decir que sólo en caso de dolo deberán responder por sus actos lesivos, sino que habrán de hacerlo siempre que hayan vulnerado lo que la buena fe imponía para el caso en concreto...". Clara I. Asúa González, La Culpa *in contrahendo* (*Tratamiento en el Derecho Alemán y presencia en otros ordenamientos*), Universidad del País Vasco, (1989), en la pág. 287.

*contrahendo* (*Tratamiento en el Derecho Alemán y presencia en otros ordenamientos*), Universidad del País Vasco, (1989), en la pág. 80. De acuerdo a esta definición, "la presencia o ausencia de negligencia se constataría tomando como referencia los conocimientos y las capacidades típicas del ámbito social o profesional de que se trate". *Ibid.*

Hemos resuelto que para determinar si ha mediado culpa en la terminación de unos tratos preliminares "es preciso considerar las circunstancias del rompimiento, específicamente: 1) el desarrollo de las negociaciones, 2) cómo comenzaron, 3) el curso que siguieron, 4) la conducta de las partes durante su transcurso, 5) la etapa en que se produjo el rompimiento, y 6) las expectativas razonables de las partes en la conclusión del contrato, así como cualquier otra circunstancia pertinente conforme a los hechos del caso sometidos a escrutinio judicial." Prods. Tommy Muñiz v. COPAN, supra, en la pág. 530; Torres v. Gracia, 119 DPR 698, 705 (1987). Cabe señalar que estos factores deben considerarse con una óptica restrictiva, más bien que liberal. Torres v. Gracia, Id.

III.

Examinemos ahora el caso que nos ocupa. La señora Alvarado aduce que se retiró de las negociaciones para la venta de su negocio por una causa legítima y que por esa razón no debe imponérsele el pago de los gastos incurridos por los demandantes. Arguye, además, que siempre estuvo disponible para reunirse con la señora Colón y ofrecerle información sobre su negocio, que le proveyó un libro

donde se llevaban las cuentas del negocio y que "no tomó las negociaciones en serio" porque la señora Colón nunca le había entregado cantidad alguna de dinero ni había solicitado el financiamiento necesario para llevar a cabo la compra. Su explicación no nos persuade, pues la prueba confirma todo lo contrario, es decir, el avanzado estado de la negociación entre las partes. Así, consta en autos que hubo un acuerdo en cuanto al objeto (nombre, activos y "goodwill" del negocio), al precio de $350,000 y a la causa, es decir, a la transmisión de la titularidad sobre el bien vendido. En este sentido, lo único que parece haber faltado era el acuerdo sobre el plazo para pagar, pues la compradora se obligó, inclusive y sin margen a dudas, a entregar el dinero en su totalidad.

Fue la señora Alvarado quien inició las negociaciones, ofreciendo el negocio en venta a la señora Colón. Los tratos preliminares duraron de cinco a seis meses, hasta que la señora Alvarado manifestó que había desistido de la venta. Durante ese tiempo las partes sostuvieron varias conversaciones y reuniones, con el propósito de obtener la información necesaria para que se pudiese materializar el acuerdo. La prueba documental y testifical presentada por la señora Colón sostiene cabalmente que ésta realizó distintas gestiones relacionadas a la compraventa del negocio que eran conocidas por la señora Alvarado y que significaban gastos para la señora Colón.[13] Cabe señalar que la expectativa de la señora Colón nacía, en parte, de que la única persona

---

[13] El foro de instancia tuvo la oportunidad de escuchar el testimonio, tanto de la señora Colón como el de la C.P.A. Carmen Román, con relación a las gestiones realizadas por éstas y estos testimonios le merecieron credibilidad.

con quien la señora Alvarado estaba negociando la venta del negocio era con ella.

Durante esos meses y mientras se llevaban a cabo esas gestiones, la señora Alvarado no indagó sobre las posibles consecuencias contributivas de la venta del negocio. El foro apelativo entendió, correctamente, que el hecho de que la señora Alvarado no consultara anticipadamente con un profesional sobre las consecuencias contributivas de la transacción denota negligencia de su parte en el proceso de negociación. Después de todo, se trataba de un negocio que, alegadamente, le dejaba grandes ganancias y cuyo precio se estableció en $350,000.

La única mención en autos sobre el impacto contributivo de la transacción como motivo para el retiro de señora Alvarado de las negociaciones surge del testimonio de la compradora, señora Colón, como algo que la peticionaria le dijo de paso por teléfono cuando le informó que retiraba la oferta de venta. Es de notar que esta conversación concluyendo las negociaciones sucedió a escasamente una semana de haberse reunido la vendedora con la compradora y de ésta haber aceptado pagar el precio requerido, en la forma requerida. Según determina el Tribunal de Primera Instancia (determinación de hechos núm. 34), la peticionaria "no expuso razón alguna para negarse a vender". Sencillamente, como no se había concretado la fuente de financiamiento, entendió que "no tenía compromiso y no tomó en serio las negociaciones." La propia vendedora afirma que cuando la compradora la volvió a llamar, "yo le dije que no, no quería vender el negocio", sin más. (Véase pág. 196 de la transcripción). Parece evidente que el Tribunal de Primera Instancia no

dio crédito a la alegación de impacto contributivo como justificación para el cese abrupto de las negociaciones.

Por el contrario, el Tribunal de Primera Instancia eliminó toda alegada expresión sobre el asunto contributivo de la exposición narrativa que la vendedora se proponía someter ante el foro apelativo. En la exposición propuesta, en la que hubo que "reconstruir" parte del testimonio de la vendedora porque se habían borrado algunas de las cintas del tribunal, la señora Alvarado informaba que se había enterado del alegado impacto contributivo durante un juego de baloncesto de su hijo, al hablar con el papá de un amiguito de éste y comentarle sobre el negocio. Esa "reconstrucción" el Tribunal de Primera Instancia la eliminó de la exposición narrativa en su totalidad y concluyó, que la vendedora no expuso razón alguna para negarse a vender.

En sus escritos de apelación ante el Tribunal de Apelaciones y de certiorari ante nosotros, la peticionaria no cuestiona que el trámite de compraventa se encontraba en un estado avanzado. Las reuniones entre las partes, y la información y documentos que solicitó y se entregaron a la compradora, incluyendo el libro en el que se llevaba constancia de todo lo sucedido en el negocio. La transcripción de la prueba confirma la complejidad de la negociación, la extensa participación de la contable de la compradora y el envolvimiento de las personas con poder decisional, en particular, la Presidenta de la corporación, la vendedora, señora Alvarado.

A tenor con lo anterior, concluimos que las actuaciones negligentes de la señora Alvarado mantuvieron las expectativas de la señora Colón de que el negocio se

realizaría y provocaron que ésta incurriera en gastos para su consecución. Coincidimos con los foros de instancia y apelativo en que procede responsabilizar a la señora Alvarado bajo la doctrina de culpa *in contrahendo*.

IV.

En su segundo señalamiento de error, la señora Alvarado sostiene que el foro apelativo erró al "aceptar la determinación del Tribunal de Primera Instancia de conceder daños emocionales...". Tiene razón.

Nuestro ordenamiento jurídico provee compensación para dos tipos de daños: los pecuniarios o económicos y los morales, que incluyen, a su vez, los sufrimientos y las angustias mentales. <u>Cintrón Adorno v. Gómez</u> 147 DPR 576 (1999), en la pág. 587.[14] La obligación de compensar el daño moral puede surgir como resultado del incumplimiento de un contrato o del incumplimiento del deber general de diligencia dispuesto en el artículo 1802 del Código Civil, 31 LPRA § 5141. En el ámbito extracontractual, nuestra jurisprudencia nunca ha distinguido entre daños físicos, materiales o morales para efectos de compensación. <u>García</u>

---

[14] Según explicamos en <u>Cintrón Adorno v. Gómez</u>, supra, en la pág. 589, citando a G. Ortiz Ricol,[14] el daño moral es "...[p]or exclusión, el daño no patrimonial,... el daño que no recae directamente sobre el patrimonio de una persona o que cayendo sobre bienes objetivos, ocasione o no lesión material en los mismos, **causa una perturbación anímica en su titular**, cualquiera que sea el derecho que sobre ello se ostente." (Énfasis nuestro). La finalidad que se persigue al concederle al lesionado una partida de daños emocionales es "indemnizar el dolor, los sufrimientos y las angustias mentales que padece una persona como consecuencia de un acto culposo o negligente."Id., en la pág. 597.

Pagán v. Shiley Caribbean, etc., 122 DPR 193 (1988).[15] No así en el campo contractual, en el que por muchos años nos negamos a indemnizar los daños morales por incumplimiento de contrato, hasta que en Camacho v. Iglesia Católica, 72 DPR 353 (1951),[16] reconocimos que también debían ser indemnizados éstos daños, siempre que fueran previsibles al momento de constituirse la obligación.[17]

En Tommy Muñiz v. COPAN, supra, la opinión mayoritaria no analiza cuáles daños son compensables como resultado de la culpa in contrahendo, aunque los votos particulares abordan el tema.[18] En RBR Const., S.E. v.

---

[15]  Por el contrario, hemos definido "daño", como "todo aquel menoscabo material o moral que sufre una persona, ya en sus bienes vitales naturales, ya en su propiedad o en su patrimonio, cansado en contravención a una norma jurídica y por el cual ha de responder otra". Cintrón Adorno v. Gómez, supra, en la pág. ____.

[16]  Véanse, contrario sensu, González Mena v. Dannermiller Coffee Co., 48 DPR 608 (1935); Díaz v. Cancel, 61 DPR 888 (1943); Díaz v. Palmer, 62 DPR 111 (1943).

[17]  Nuestro derecho de compensación del daño responde, como sabemos, al principio de previsibilidad. Así, hemos resuelto que "nadie viene obligado a responder de aquellos sucesos que no hubieran podido preverse, o que previstos fueran inevitables". Salvá Matos v. A. Díaz Const. Corp., 95 DPR 902 (1968), en la pág. 906. El deber de previsión está atado, claro está, a la prudencia, pues excluye la obligación de prever "sucesos totalmente insólitos y extraordinarios", aunque éstos sean previsibles en teoría. Jiménez v. Peregrina Espinet, 112 DPR 700 (1982), en la pág. 706. Los daños resarcibles por incumplimiento contractual también están sujetos al requisito de previsibilidad. Código Civil, artículo 1058, 31 LPRA 3022. En atención a esta norma, hemos admitido la compensación de aquellos daños morales que sean previsibles al momento de constituirse la obligación y que sean consecuencia necesaria de la falta de cumplimiento del contrato. Artículo 1060 del Código Civil, 31 LPRA § 3024; Soc. Gananciales v. Vélez & Asoc., 145 DPR 508 (1998), en la pág. 523; Camacho v. Iglesia Católica, supra, en la pág. 360. Véanse, Pereira v. I.B.E.C., 95 DPR 28 (1967); González v. Centex Const. Co., etc., 103 DPR 82 (1974), en la pág. 88; De Jesús v. Ponce Housing Corp., 104 DPR 885 (1976), en la pág. 889.

[18]  Así, la opinión disidente del Juez Asociado señor Díaz Cruz coincide con Díez Picazo y Gullón, Sistema de Derecho

<u>A.C.</u>, 149 DPR 836, 848 (1999), con relación a la indemnización del licitador perdidoso en una subasta ilegalmente anulada o adjudicada, expresamos que los daños extracontractuales que podría recuperar el licitador, ya fuera por culpa *in contrahendo* o por abuso de derecho, son limitados e incluyen, "por ejemplo, los costos en los que se incurrió en prepararse para la licitación arbitrariamente anulada y otros gastos relacionados, incluyendo los intereses desde que se incurre en éstos." No abundamos entonces, porque no era necesario, en las fuentes doctrinales de esa limitación.

Explica Díez Picazo que "[l]a doctrina es pacífica en el sentido de que el deber de resarcimiento por culpa *in contrahendo* alcanza sólo al llamado 'interés negativo'". Díez Picazo, supra, en la pág. 192. Coinciden los tratadistas en que éste, a su vez, comprende "los gastos y desembolsos llevados a cabo en vista de la ejecución del contrato proyectado". *Ibid*. Véase Castán Tobeñas, *Derecho Civil Español, Común y Foral*, Madrid, Reus, S.A. 1967,

_____

Civil, Vol. II 3ra ed. (1980), en que "hay que indemnizar a la parte que confiaba honestamente en la conclusión del acuerdo **los gastos en que haya incurrido** (pago de asesores, desplazamientos, interés del dinero conseguido para cumplir la prestación a la que le obligaría el contrato, etc.)". <u>Prods. Tommy Muñiz v. COPAN</u>, supra, en la pág. 537 (Énfasis nuestro). Distingue igualmente entre: "(1) responsabilidad limitada a gastos en caso de fundada expectativa de final formación del contrato; y (2) responsabilidad en daños y perjuicios de quien actúa de mala fe, porque de exigir igual responsabilidad en uno y otro caso se produciría un temor de riesgo en los contratantes que frenaría y hasta enervaría la deseable fluidez y libertad de acción en toda la etapa precontractual". <u>Prods. Tommy Muñiz v. COPAN</u>, supra, en la pág. 538. Por su parte, el Juez Asociado señor Dávila condiciona su voto de conformidad a que la culpa *in contrahendo* se limite al retiro propiamente abusivo de la negociación y a que se delimite su alcance a "los perjuicios englobados en el llamado interés negativo". <u>Prods. Tommy Muñiz v. COPAN</u>, supra, en la pág. 540 (Énfasis nuestro).

Tomo 3, pág. 469 (Énfasis nuestro). Así mismo, Alonso

Pérez, citando a Faggella, explica que "quien, confiando

en la honorabilidad ajena, consintió en tratar, y en base

a tal confianza hizo gastos, elaboró proyectos, realizó

viajes, etc., ha sufrido **una pérdida patrimonial** que la

otra parte está obligado [*sic*] a reparar". Mariano Alonso

Pérez, *La responsabilidad Precontractual,* 47 Rev. Crítica

de Derecho Inmobiliario 859 (julio-diciembre 1971), pág.

891. (Énfasis nuestro).

Más específicamente, Moreno Quesada distingue entre

los "gastos-espontáneos" —aquellos que una persona realiza

para atraer la atención de posibles contratantes, sin

depender ni descansar en representaciones o conducta de la

otra parte (ej. gastos en anuncios) —y los "gastos

provocados" —"aquellos cuya realización encuentran su

razón de ser en el consentimiento del contratante" (ej.

los necesarios para la preparación del proyecto de

contrato: viajes, planos, peritos, etc.). Estos últimos

serán resarcibles; los primeros no. Moreno Quesada, supra,

en las págs. 54-55.[19]

Ahora bien, resulta difícil justificar la limitación

impuesta por la doctrina a la responsabilidad por culpa *in

contrahendo*, si la concebimos estrictamente como una

modalidad de culpa extracontractual, sin considerar que,

---

[19] Algunos estudiosos, entre estos Alonso Pérez, añaden las pérdidas ocasionadas "por desaprovechar ocasiones favorables de celebrar un contrato con otras personas." Alonso Pérez, supra, en la pág. 905. Díez Picazo, supra, en la pág. 192, discrepa de esta interpretación de lo que la doctrina alemana denomina "daños a la confianza". En esa misma corriente de pensamiento se encuentra Manuel Albaladejo, quien señala que la obtención del beneficio que hubiera producido el contrato no constituye, propiamente, perjuicio compensable. M. Albaladejo, *Derecho Civil*, 8va ed., Barcelona, Ed. Bosch, 1989, T. II. Vol. I, pág. 402.

como señala el Profesor Godreau Robles "el valor y el interés que pretende protegerse es el de la *lealtad*". Michel Godreau Robles, *Lealtad y Buena Fe Contratactual*, 58 Rev. Jur. UPR 367, 394 (1989). (Énfasis en el original). En efecto, no podemos obviar que, distinto a otros supuestos de responsabilidad extracontractual, la responsabilidad por culpa *in contrahendo* surge como consecuencia de una relación social **preexistente** entre las partes negociantes, quienes por razón de esa relación, que anteriormente hemos llamado "de carácter social", vienen obligados a actuar de acuerdo a los postulados de la buena fe.[20] Tommy Muñiz v. COPAN, supra, en la pág. 526; Torres v. Gracia, supra, en la pág. 703.

La dificultad que entraña ubicar la culpa *in contrahendo* en una de la figuras jurídicas reconocidas por nuestro ordenamiento civil no pasó desapercibida cuando este Tribunal resolvió el caso medular de Prods. Tommy Muñiz v. COPAN, supra. Consideramos entonces la posibilidad de que se tratara de una responsabilidad *sui generis*, antes de optar por ubicarla en el marco de la responsabilidad extracontractual. Prods. Tommy Muñiz v. COPAN, supra, en las págs. 525-529. Sin embargo, nuestra decisión sobre la naturaleza jurídica de esta figura no

---

[20] Según explica Puig Brutau: "Ha de tenerse en cuenta la diferencia entre daño contractual y extracontractual. En el primero hay una relación jurídica anterior al daño entre el sujeto que lo causa y el que lo sufre, y su objeto sólo se modifica al quedar sustituido el cumplimiento por el resarcimiento (*id quod interest*) respecto a la prestación que era objeto de la obligación. En el segundo hay incumplimiento de una obligación genérica, que pesa sobre una generalidad de personas, con el que se produce el daño extracontractual. La obligación propiamente específica sólo nace a consecuencia de la producción del daño". José Puig Brutau, *Fundamentos de Derecho Civil*, T. II, Vol. III en la pág. 181 (1984).

nos impidió reconocer que "la amplia gama de supuestos sobre los cuales puede asentarse la responsabilidad precontractual hace necesario que en el análisis del problema se considere qué figura jurídica –culpa, dolo, fraude, buena fe, abuso del derecho u otros principios generales del derecho– responde más adecuadamente como fundamento jurídico para la solución del caso". <u>Prods. Tommy Muñiz v. COPAN</u>, supra, en las págs. 529-530; <u>Torres v. Gracia</u>, supra, en las págs. 704-705.[21]

No se trata, pues, de la obligación de diligencia genérica y *erga omnes* impuesta por el artículo 1802 del Código Civil. Es una obligación hacia una persona determinada, que surge en aquel momento en el curso de las negociaciones en el cual el ejercicio del derecho de una parte a retirarse, corolario del principio de la autonomía

---

[21] Los autores han reconocido las dificultades que plantea determinar la naturaleza jurídica de esta figura. Véase, por ejemplo, J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1978, T. II, Vol. I, pág. 228: "…[a]l tratar de señalar el fundamento legal de la responsabilidad han surgido dudas. Por un lado, el contrato no llegó a celebrarse y no puede tratarse, por consiguiente, de responsabilidad contractual; por otro lado, el apoyo exclusivo en el principio que impone la responsabilidad extracontractual... parece demasiado vago...." Más adelante explica que la responsabilidad por culpa *in contrahendo* no se basa "en la violación del deber genérico *alterum non laedere*, sino en el quebrantamiento de la lealtad y confianza que las partes se deben recíprocamente por el hecho de entrar en negociación." Puig Brutau, supra, en la pág. 230. Véase también M.A. del Arco Torres y M. Pons González, Diccionario de Derecho Civil, Pamplona, Ed. Aranzadi, 1984, T.1, en la pág. 404, citado en Torres v. Gracia, supra, en la pág. 704, n. 2: "A nuestro entender —y según Adriano De Cupis (*op. Cit.*, p. 168)— a quien sustancialmente seguimos en la exposición del presente epígrafe, **se está en presencia de una relación obligacional** (precedente a la que será establecida en el contrato) en cuanto [a]l vínculo jurídico referido liga a una parte y a otra por el hecho de haber principado los tratos. **La iniciación de los tratos es el hecho del que se deriva la obligación de una parte para la otra, de tener un comportamiento concorde a la buena fe**". (Énfasis nuestro).

de la voluntad, activa la protección de la confianza depositada por la otra y resulta contrario al principio inmanente de la buena fe.

La realidad es que al igual que otros supuestos de responsabilidad que nacen por aplicación de los principios derivados de la buena fe, la culpa *in contrahendo* carece de regulación propia. Por eso, aunque la hemos ubicado, por analogía, bajo la égida del artículo 1802 del Código Civil, venimos obligados a continuar colmando, caso a caso, los vacíos normativos subsistentes, en aquellos aspectos que no son del todo compatibles con los elementos típicos de la responsabilidad extracontractual.[22] Para ello, el artículo 7 de nuestro Código Civil, que nos prohíbe rehusarnos a fallar "a pretexto de silencio, obscuridad, o insuficiencia de la ley", nos remite a la equidad, como fuente para elaborar las normas necesarias.[23]

_____

[22] Surge una laguna cuando la ley no contiene una disposición necesaria o conveniente para la protección de los intereses de la comunidad o de sus miembros. Es en las "lagunas" donde se manifiesta la iniciativa de jueces y tribunales, que perfilan, moldean y adaptan la ley a nuevas situaciones. Felipe Clemente de Diego y Gutiérrez, *De las Lagunas de la Ley*, págs. 39-40, Madrid, 1945.

[23] A partir del reconocimiento expreso de la función seminal de la equidad en nuestro sistema de derecho en Silva v. Comisión Industrial, 91 DPR 891 (1965), pasando luego por la afirmación del valor normativo del contenido ético del ordenamiento jurídico en Velilla v. Pueblo Supermarkets, Inc., supra, hemos reconocido fuentes de obligaciones extrañas a las categorías tradicionales concretamente establecidas en nuestro ordenamiento civil. Así, hemos admitido la fuerza generadora de obligaciones que tienen los actos propios y hemos reiterado la posibilidad vinculante de la declaración unilateral de voluntad,(Int. General Electric v. Concrete Builders, 104 DPR 871 (1976); Ramírez v. Gautier, 87 DPR 497 (1963)), del abuso del derecho, (Soriano Tavárez v. Rivera Anaya, 108 DPR 663 (1979)), del enriquecimiento injusto, (Silva v. Com. Ind., supra; Ortiz Andujar v. ELA, 122 DPR 817 (1988)) y, en lo que aquí nos concierne, de la ruptura culposa de los tratos contractuales preliminares. Todas éstas figuras han permitido al derecho moderno "contrarrestar los efectos formalistas del sistema

Código Civil de Puerto Rico, artículo 7, 31 LPRA § 7. Olmo v. Young Rubicam, 110 DPR 740 (1981); Asoc. de Condóminos v. Los Frailes, 2001 TSPR 116 en la pág. 6. Véanse Corraliza v. Bco. Des. Eco., res. 9 de enero de 2001, 2001 TSPR 2, 153 DPR ___ (2001); Ortiz Andújar v. ELA, 122 DPR 818 (1988). Flores v. Meyers Bros. of P.R., 101 DPR 689 (1973); Robles Ostolaza v. UPR, 96 DPR 583 (1968); Collazo Cartagena v. Hernández Colón, 103 DPR 870 (1975). Véase además, Asociación de Farmacias de la Comunidad v. Departamento de Salud, res. el 23 de mayo de 2002, 156 DPR ___ (2002).

El alcance limitado que la doctrina reconoce a la indemnización por culpa *in contrahendo* responde, a nuestro entender, a dos fundamentos. El primero surge, precisamente, de la indubitada genealogía de la figura de la culpa *in contrahendo* como hija de la equidad, cuyo propósito es sancionar el quebrantamiento de la confianza. Por eso, según afirma Ghersi, no es necesario forzarla en una categoría jurídica predeterminada: "En efecto, frente al quebrantamiento de la buena fe se impone el deber de reparar el daño causado **por esa sola circunstancia**, sin que deba requerirse la presencia de otro factor de atribución, ya que la sola violación del precepto constituye fundamento suficiente para el nacimiento de la obligación resarcitoria, sin perjuicio de que medien en el caso otros factores subjetivos (dolo o culpa)". Carlos

---

normativo legal, echando mano a los principios generales de la buena fe... intentando la realización del ideal de justicia...". Carlos Alberto Ghersi, Teoría general de la reparación del daño, 2da ed., Buenos Aires, en la pág. 223.

Alberto Ghersi, Teoría general de la reparación de daños, 2da. ed. Buenos Aires, en la pág. 234 (1999).

Como hija de la equidad, la doctrina de culpa *in contrahendo* busca regresar a las partes a la situación en la que se encontraban antes de comenzar los tratos fallidos.[24] Por eso, según señala Asúa González, la indemnización del llamado interés negativo "pretende reponer, en términos económicos, las cosas al estado en que estarían si el perjudicado nunca hubiera oído hablar del contrato o no hubiera confiado en su validez; **por ello se le denomina también interés de la confianza**". Asúa González, supra, en las págs. 67-68, énfasis nuestro.

La indemnización por culpa *in contrahendo* es, pues, reparativa, basada en el principio de que quien vulnera la confianza depositada por otro, debe devolver a esa persona al estado en que estaría si no se hubiesen dado las circunstancias que dan lugar a la reparación. Asúa González, supra, en la página 69. Se cuida mucho la doctrina de permitir que a través de la indemnización la parte agraviada obtenga las ventajas económicas que hubiera representado llevar a feliz término el proceso de negociación (interés positivo). En vez, el objetivo es "colocar al perjudicado como si no hubiese emprendido los contactos negociales". *Id.*, en la página 288.[25]

---

[24] Por definición, la equidad busca la justicia del caso individual. Es el fiel de la balanza, la moderadora sin par de la ley. Véase, Aristóteles, Ética a Nicomaco, Libro 5, Cap. 10, citado en James B. White, *The Legal Imagination*, (1973) en la pág. 647.

[25] En este sentido, la culpa *in contrahendo* guarda analogía, por su origen y finalidad, con otra figura nacida también de la equidad, la del enriquecimiento injusto. Ésta también procura deshacer una situación y restablecer un patrimonio al estado en que se encontraba antes de ser desplazado a otro sin causa, es decir, sin

El segundo fundamento para limitar la indemnización por culpa *in contrahendo* responde a la fuerte política jurídica a favor del tráfico jurídico y la libertad de contratación. Los tratadistas basan su conclusión sobre el alcance limitado de la responsabilidad por culpa *in contrahendo* en la necesidad de no coartar la libertad de contratar que fundamenta nuestro derecho contractual. Ello dirigido, claro está, a proteger la estabilidad que requiere el desarrollo económico y el tráfico comercial. [26] Resulta igualmente necesario y tiene igual propósito delimitar claramente los lindes entre la responsabilidad que puede surgir de la ruptura de tratos preliminares y la que corresponde a la oferta y su consideración. Todo ello apunta a la necesidad de sujetar el alcance de la responsabilidad por culpa *in contrahendo* a consideraciones de política pública que no están presentes usualmente en la determinación de responsabilidad extracontractual. Por eso explicamos en <u>Torres v. Gracia</u>, supra, en la página

explicación válida en derecho. Para ello se vale del mecanismo de la al argumento analógico, Encarna Roca Trías, restitución. <u>Ortiz Andújar v. ELA</u>, supra. Véase, en cuanto en Albaladejo y Díaz Alabart, *Comentarios al Código Civil y Compilaciones Forales*, T. I Vol. 1, en la pág. 598, Ed. Rev. Der. Priv., Madrid, 1992. La validez de la solución que propone el método analógico la brinda el convencimiento de que la semejanza entre los supuestos regulados por la norma existente y los supuestos que carecen de norma concreta justifica la aplicación a éstos de la regla dispuesta para los primeros. A ello se refiere el Código Civil español cuando requiere que entre uno y otros "se aprecie identidad de razón." Código Civil, artículo 4, inciso 1, Editorial Tecnos S.A., Madrid, 1985. Encontramos "identidad de razón" entre los supuestos comprendidos en la acción por culpa *in contrahendo* y en la acción por enriquecimiento injusto, por la similitud del fundamento a la que responde la delimitación de responsabilidad en ambos casos.

[26] Véase, por ej. Puig Brutau, *Fundamentos de Derecho Civil*, T. II, Vol. I, Barcelona (1978), en la pág. 5: "El derecho de contratos ha representado tradicionalmente el área de más plena realización de la voluntad del individuo".

710, que la doctrina de culpa *in contrahendo* "de por sí debe ser aplicada restrictivamente".

A la luz de lo anterior, resolvemos que el deber de indemnizar por el rompimiento culposo de los tratos preliminares alcanza, de ordinario, tan solo al llamado "interés negativo", es decir, a la reparación de los gastos sufridos y pérdidas patrimoniales derivadas del proceder arbitrario de la parte que incurre en culpa.

V.

Arguye, por último, la señora Alvarado, que la señora Colón no presentó prueba fehaciente de los gastos alegadamente incurridos para la consecución del negocio, por lo cual erró el foro apelativo al confirmar la partida de $8,400.00 por ese concepto. Recordemos que en su testimonio, la señora Alvarado reconoció que la señora Colón había incurrido en ciertos gastos con el objetivo de que se materializara el acuerdo y que se ofreció a reembolsarle por dichos gastos. No obstante, al conocer la cantidad que la señora Colón alegaba haber gastado la encontró excesiva y se negó a pagarla.

La prueba documental y testifical recibida por el foro de instancia en cuanto a los gastos incurridos por la señora Colón le mereció a éste entera credibilidad. En numerosas ocasiones hemos sostenido que un tribunal revisor no debe sustituir su criterio por el del foro de instancia, salvo cuando estén presentes "circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto." Coop. Seguros Múltiples de P.R. v. Lugo, 136 DPR 203 (1994), en la pág. 208.

Examinado en su totalidad los autos del caso, resolvemos que el foro de instancia no actuó movido por pasión, prejuicio, parcialidad o error manifiesto, por lo que no intervendremos con su apreciación. De igual modo, no intervendremos con la imposición que hizo el foro de instancia sobre costas y honorarios de abogados concedidos a favor de la demandante.

Por los fundamentos expresados, modificamos parcialmente la sentencia dictada por el Tribunal de Apelaciones, a los efectos de eliminar la partida concedida por daños emocionales y así modificada, se confirma dicha sentencia.

Se dictará sentencia de conformidad.


Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Dolores Colón

Demandantes-Recurridos

v.

Glamorous Nails & Boutique, Inc., Marta Larissa Alvarado de Silverio, et. als.

Demandados-Recurrentes

CC-2004-275

CERTIORARI

SENTENCIA

San Juan, Puerto Rico, a 3 de febrero de 2006.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, modificamos parcialmente la sentencia dictada por el Tribunal de Apelaciones a los fines de eliminar la partida concedida por daños emocionales y así modificada, se confirma dicha sentencia.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Rodríguez Rodríguez concurre con el resultado, sin opinión escrita. El Juez Asociado señor Fuster Berlingeri disiente sin opinión escrita y el Juez Asociado señor Rivera Pérez no intervino.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo