Opinión disidente emitida por la
Juez Asociada Señora Ro-dríguez Rodríguez,
a la que se une el Juez Presidente Señor Hernández Denton.
[Los Códigos de Derecho Civil] es-tán ordenados dentro de un sistema de instituciones de derecho, que no permite aislar una sola disposición de las otras... Los Códigos se insti-tuyen sobre unas bases fundamen-tales, una ley de bases, que se les entregan a los cuerpos codificadores como normas generales, para crear un sistema de principios jurídicos, armónicos entre sí, que puedan pro-ducir la unidad doctrinal que nece-sita toda institución de derecho para su validez. Casualmente es esta armonía de los distintos aspec-tos doctrinales, todas dirigidas ha- *72 cia un mismo principio jurídico, lo que hace tan deleitosa la tarea del civilista.(1)
La Opinión que emite hoy este Tribunal en el caso de autos comenta que este Foro tiene ante sí la oportunidad de auscultar si dentro de la doctrina de culpa in contra-hendo procede compensar a una parte por aquellas ganan-cias dejadas de percibir al no perfeccionarse el acuerdo previsto. Pese a esbozar una elocuente respuesta a esa in-terrogante, disentimos por entender que la figura mencio-nada ni la disposición final del caso son atinadas a la con-troversia presente. Todo lo contrario, ante el escenario fáctico de este caso, el proceder de la Opinión mayoritaria desvirtúa la aplicación restrictiva de la doctrina de culpa in contrahendo, lo que altera el estado de Derecho vigente.
El error de la Opinión mayoritaria versa en la aplica-ción de dicha figura a una controversia en la que entre las partes ya había una relación obligacional y para lo que el Código Civil dispone de un curso a seguir sin tener que recurrir a una figura “hija de la equidad”. Colón v. Glamourous Nails, 167 D.P.R. 33, 56 (2006). Con este pro-ceder, se resuelve por vía de una figura extraordinaria un asunto para lo que hay unas instituciones de Derecho ya codificadas y las que, imbricadas armónicamente, produ-cen esa unidad doctrinal a la que alude el Juez Asociado Emilio S. Belaval en el epígrafe que colocamos al inicio de esta Opinión en ánimo de ser epígono de dicho pensa-miento.
Disentimos, en fin, porque al aplicar una figura jurídica a un caso particular hay que considerar todos los escena-rios que circunscriben a una situación de hechos y seleccio-nar aquella que con mayor precisión se ajuste al caso y que, a su vez, propenda a un mejor desarrollo del Derecho.
*73 ) — I
Los hechos que rodean esta controversia se pueden re-sumir de la siguiente manera. Puerto Rico Freight System (PRFS) y la Compañía de Comercio y Exportación de Puerto Rico (CCE)(2) tenían una relación contractual de arrendamiento de una propiedad (Edificio #11) de la CCE. Como parte de un proceso judicial entre éstas, las partes llegaron a un acuerdo transaccional sin perjuicio para po-nerle fin a aquel litigio. En diciembre de 1999 se firmó dicho acuerdo titulado Moción de Desistimiento por Esti-pulación de las Partes, en donde acordaron desistir del pleito sujeto a las siguientes condiciones:
B) Las partes acuerdan que la parte co-demandada, ahora Corporación para el Desarrollo de las Exportaciones le arren-dará al demandante el edificio número 15 del Centro Mercan-til Internacional, el cual al presente se encuentra en construc-ción, siempre y cuando las partes lleguen a un acuerdo en los asuntos que están negociando actualmente.
C) Con relación al contrato del Edificio 15 el señor Padilla solicita que:
1. Que el contrato sea de 10 años renovable a 10 años más.
2. El canon de arrendamiento no será mayor de cinco dó-lares con cincuenta centavos ($5.50) anual el pie cuadrado, por el término del contrato.
3. La Corporación será responsable de todas las mejoras, diseños y construcciones estructurales y el señor Padilla será responsable de todas las mejoras interiores y de oficina.
4. Las mejoras que realice el señor Padilla en el Edificio 15 serán aprobadas previamente por la Corporación. Dicha aprobación no puede ser irrazonablemente denegada. Al con-cluir el contrato, la Corporación, a su costo, podrá eliminar estas mejoras.
5. [En la] eventualidad de que la Corporación resuelva el contrato por falta de pago de canon de arrendamiento, el *74 señor Padilla será responsable por los cánones de arrenda-miento mientras las facilidades del Edificio 15 estén deshabilitadas. La Corporación será responsable de hacer ges-tiones de buena fe para conseguir un nuevo arrendatario.
D) El señor Padilla hará las gestiones para convertirse en operador independiente de la Zona Libre. De convertirse en operador independiente de la Zona Libre, se revisará el con-trato de arrendamiento del Edificio 11 a los efectos de incluir al arrendador dentro de los incentivos y/o ayudas que estuvie-sen vigentes para los operarios de la Zona Libre.
E) La Corporación para el Desarrollo de las Exportaciones se compromete a presentar ante su Junta de Directores las peticiones del señor Padilla para su estudio y consideración, sin que por ello se entienda que su gestión constituye una aceptación o compromiso de que las peticiones serán aprobadas. Se aclara que específicamente las peticiones nú-mero 1 y 2 del apartado C) constituyen peticiones fuera del ámbito de poderes de otros funcionarios que no sea la Junta de Directores de la Corporación y sólo pueden ser aprobad [a] s expresamente por [e]stos últimos.
F) Una vez las partes hayan llegado a un acuerdo, la Cor-poración se compromete a tramitar prontamente la redacción y aprobación del contrato de arrendamiento del Edificio 15. Moción de desistimiento por estipulación de las partes, Apén-dice, págs. 2151-2153.
Tras la suscripción del acuerdo de transacción de 1999 pasaron dos años sin que la Junta de Directores de la CCE (la Junta) aprobara el contrato de arrendamiento del Edi-ficio #15. En el ínterin, PRFS realizó gestiones para ade-cuar el edificio a sus necesidades comerciales y la gerencia de la CCE siempre se mostró dispuesta a acceder a dichas peticiones. Entre las gestiones realizadas hay que destacar la contratación de una firma de arquitectos para que efec-tuara un estudio sobre las modificaciones que requería el Edificio #15 para adaptarlo a las operaciones de PRFS. Sentencia Tribunal de Primera Instancia, Apéndice, pág. 793.
Es importante mencionar que la contratación de esa firma de arquitectos por parte de PRFS se realizó volunta-riamente, previo a suscribir el contrato de transacción en diciembre de 1999, puesto que antes de esa fecha PRFS ya *75 había indicado su interés en ese edificio. Sentencia Tribunal de Primera Instancia, Apéndice, págs. 792-793. Véase, también, Transcripción de la Vista en su Fondo, Apéndice, págs. 1096-1098. Tras firmar el acuerdo transaccional en cuestión, la firma de arquitectos preparó los planos corres-pondientes e hicieron unos señalamientos a la CCE sobre los asuntos estructurales que se debían atender en el Edi-ficio #15 para adaptarlo al negocio de PRFS. Todos los se-ñalamientos u órdenes de cambio fueron acogidos por la parte peticionaria, a lo que ésta invirtió $254,519.96.(3)
Por su parte, PRFS también invirtió dinero en arreglos del interior del edificio y otros asuntos relacionados con el futuro arrendamiento. (4) A pesar de que el acuerdo de tran-sacción contenía una condición suspensiva para el perfec-cionamiento del contrato de arrendamiento, las partes con-tinuaron un intercambio comercial relativo al Edificio #15 a sabiendas de que la Junta no había aprobado nada al respecto y basado en una autoexpectativa especulativa de ambas partes de que se iba a firmar el contrato.(5)
En el 2000, la gerencia de la CCE realizó un estudio de cánones de alquiler de las instalaciones de la corporación. *76 Posteriormente, la gerencia de la peticionaria envió a la Junta dos memorandos idénticos con recomendaciones re-lacionadas al arrendamiento de PRFS. En éstos se indicó que a pesar del nuevo esquema de rentas preparado en el 2000, se recomendaba que a PRFS se le cobrara un canon diferente que sería escalonado y por un término de diez años. Finalmente, en la reunión de la Junta del 24 de mayo de 2001, ésta decidió que el arrendamiento sería a un tér-mino de cinco años a $6.00p2 por los primeros dos años y $7.00p2 por los próximos tres años.(6) Ante esa contraoferta de la corporación pública, PRFS se mostró en desacuerdo y eventualmente inició el presente pleito judicial.
Los tribunales inferiores sentenciaron que la CCE fue negligente al hacer falsas representaciones a PRFS sobre la firma del contrato de arrendamiento. Concluyeron que, al así proceder, la CCE frustró la expectativa creada en el demandante de perfeccionar el contrato de arrendamiento. El Tribunal de Apelaciones, al confirmar al foro de instan-cia, sostuvo que por haber ocasionado un daño en la etapa previa al perfeccionamiento del contrato de arrenda-miento, se configuró la llamada culpa in contrahendo. Es nuestra postura que ello constituye un error en la aplica-ción del Derecho a esta controversia, puesto que ésta se ha de resolver mediante el articulado del Código Civil y no mediante figuras de aplicación restrictiva. Veamos.
1 — I I — i
A
Es norma reiterada en nuestro ordenamiento que nadie está obligado a contratar. Colón v. Glamourous Nails, su *77 pra, pág. 44; Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517, 526 (1982). Ahora bien, durante el transcurso de las relaciones precontractuales las partes deben ejercer un comportamiento que se ajuste a los principios de la buena fe. Colón v. Glamourous Nails, supra, págs. 44-45. Véase, también, J. Puig Brutau, Fundamentos de Derecho Civil, 3ra ed., Barcelona, Ed. Bosch, T. II, Vol. I, 1988, pág. 216; M.P. García Rubio, La responsabilidad precontractual en el Derecho español, Madrid, Ed. Tecnos, 1991, pág. 43.
En ánimos de atender las situaciones de daños ocasio-nados durante la etapa precontractual debido a la termi-nación injustificada de los tratos preliminares y a la falta del principio de buena fe en esa fase, esta Curia adoptó la figura de culpa in contrahendo en Prods. Tommy Muñiz v. COPAN, supra. Para determinar la aplicabilidad de dicha figura y adjudicar responsabilidad que conlleve un resarci-miento, determinamos que es preciso considerar seis ele-mentos: (1) el desarrollo de las negociaciones; (2) cómo co-menzaron; (3) el curso que siguieron; (4) la conducta de las partes durante su transcurso; (5) la etapa en que se pro-dujo su rompimiento, y (6) las expectativas razonables de las partes en la conclusión del contrato. íd., pág. 530. Asi-mismo, hemos sido enfáticos en que la aplicación de la doc-trina de culpa in contrahendo ha de ser restrictiva debido a una cuestión de política pública a favor del tráfico jurídico y la libertad de contratación. Colón v. Glamourous Nails, supra, págs. 47 y 57-58; Torres v. Gracia, 119 D.P.R. 698, 710 (1987).
Como señala la Opinión mayoritaria, la doctrina de culpa in contrahendo se utiliza para las fases precon-tractuales. Por consiguiente, una vez se perfecciona un contrato se aplican las disposiciones pertinentes del Libro IV del Código Civil de Puerto Rico. Aplicar irrestricta-mente la figura en cuestión dentro de una relación contractual no sólo desvirtúa la figura misma, sino que le añade *78 incertidumbre a las relaciones contractuales y al ordena-miento jurídico en sí. La claridad doctrinal le da previsibi-lidad al Derecho; en contraposición, la falta de claridad doctrinal de la Opinión mayoritaria en la aplicación de la figura de culpa in contrahendo abona a la imprevisibilidad de nuestro Estado de Derecho.
La presente controversia no puede verse de manera llana y sencilla, sino que es necesario tener presentes to-das las circunstancias que rodean al caso de autos y exa-minarlas con detenimiento. Tras un riguroso análisis de esas circunstancias, veremos que en este caso es improce-dente la aplicación de la doctrina de culpa in contrahendo.
B
A primera vista, y partiendo de una visión superficial sobre la controversia, parece que entre las partes se que-brantaron las relaciones precontractuales sobre el contrato de arrendamiento. Ahora bien, no debemos soslayar que este caso tiene su origen en un acuerdo transaccional para poner fin a un pleito anterior. En otras palabras, la pre-sente controversia plantea la situación de que dentro del contexto de una relación contractual se comienza otra re-lación obligacional. No podemos bifurcar ambas relaciones y enfocarnos en una de ellas en abstracción de la otra, como pretende hacer la Opinión del Tribunal.
Al enfrentarnos a una controversia como la presente, donde se presentan paralelamente e imbricadamente dos relaciones obligacionales, se debe analizar primero aquélla más abarcadora en donde se subsume la segunda relación que se creó a consecuencia de la primera. De encontrar una solución jurídica a la primera relación obligacional que, a su vez, disponga de la segunda relación, entonces resulta-ría innecesario incorporar doctrinas de aplicación restric-tiva para atender esa segunda relación obligacional.
*79 Según mencionamos, esta controversia surge a raíz de un acuerdo transaccional. Ahí subyace la primera relación obligacional entre las partes y de ésta surge la segunda relación relacionada a un futuro contrato de arrenda-miento. El Artículo 1709 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 4821, establece que las transacciones efec-tuadas para poner fin a un litigio son contratos. Estos con-tratos de transacción, por consiguiente, están sujetos a las disposiciones del Título I del Libro IV del Código Civil, sobre Obligaciones. Art. 1042 del Código Civil, 31 L.P.R.A. sec. 2992 (“Las obligaciones nacen de la ley, de los contra-tos ...”)•
El acuerdo transaccional en cuestión contiene dos cláu-sulas condicionales a modo de muñeca rusa o matrioska; entiéndase, una dentro de la otra. La primera cláusula condicional dispone que la transacción allí convenida está sujeta al perfeccionamiento de un contrato de arrenda-miento que tiene por objeto el Edificio #15. La segunda cláusula condicional inmersa dentro de la primera esta-blece que las peticiones de PRFS relacionadas a los térmi-nos del arrendamiento serían presentadas ante la Junta de la CCE para su estudio y consideración, sin que ello cons-tituya una aceptación de los términos solicitados.
Las obligaciones condicionales se definen como “aqué-llas cuya eficacia depende de la realización o no realización de un hecho futuro y además incierto”. Puig Brutau, op. cit., 3ra ed. rev., 1985, T. I, Vol. II. Véase, además, J.R. Vélez Torres, Derecho de obligaciones: curso de derecho civil 2da ed. rev., San Juan, Programa de Educación Jurídica Continua, Universidad Interamericana, 1997, pág. 136. El propio Código Civil establece que “[e]n las obligaciones condicionales la adquisición de los derechos, así como la resolución o pérdida de los ya adquiridos, dependerá del acontecimiento que constituya la condición”. Art. 1067 del Código Civil, 31 L.P.R.A. sec. 3042.
*80 Como se puede observar, el elemento futuro e incierto es lo que caracteriza este tipo de obligación. Véase, también, Jarra Corp. v. Axxis Corp., 155 D.P.R. 764, 773 (2001). En el caso de autos, el elemento futuro e incierto de la efecti-vidad del contrato de transacción es que se suscriba un contrato de arrendamiento. En cuanto al perfecciona-miento de dicho contrato, el elemento futuro e incierto es que se presente ante la Junta la oferta que hizo PRFS y la Junta lo apruebe.(7) Estas, por ser condiciones cuyo efecto, de cumplirse, será la adquisición del derecho a arrendar y la efectividad de la transacción, son de naturaleza suspensiva (conditio pendet). Vélez Torres, op. cit., pág. 138.
Ahora bien, el Código Civil establece que cuando el cum-plimiento de la condición dependa exclusivamente de la voluntad del deudor, la obligación condicional será nula; mientras que si depende de un tercero, será válida. Art. 1068 del Código Civil, 31 L.P.R.A. sec. 3043. En el supuesto de que la condición dependa del deudor, se denomina como una condición potestativa.
Las condiciones potestativas se dividen, según la doc-trina, en rigurosamente potestativas y simplemente potestativas. Puig Brutau, op. cit., T. I, Vol. II, págs. 95-96. Sobre este particular nos hemos expresado a los efectos de que “la doctrina delinea una distinción entre las condicio-nes rigurosamente potestativas, las cuales dejan la validez de la obligación al exclusivo arbitrio de una de las partes, y las simplemente potestativas, en las cuales el cumplimiento de la condición no está sujeto al total arbitrio de una de las partes”. (Enfasis suplido). Jarra Corp. v. Axxis Corp., su *81 pra, pág. 775.(8) En el referido caso adoptamos la distinción entre rigurosamente y simplemente potestativas, y resolvi-mos que las condiciones simplemente potestativas no anu-lan una obligación condicional al amparo del Artículo 1068 del Código Civil. íd., pág. 776.
En la controversia de autos nos encontramos con una situación particular y es que el deudor en esta obligación (la CCE) no está sujeto a un acto volitivo único. Esto, de-bido a su naturaleza de ser persona jurídica cuya adminis-tración está a cargo de una Junta de Directores integrada por nueve miembros. Ley de la Compañía de Comercio y Exportación de Puerto Rico, Ley Núm. 323 de 28 de diciembre de 2003, Art. 7, 7 L.P.R.A. sec. 1227d. Al establecerse en el acuerdo de transacción que el perfeccionamiento del futuro contrato de arrendamiento estaría condicionado a que la Junta lo aprobara, es forzoso concluir que el incum-plimiento con dicha condición no depende exclusivamente del arbitrio de un deudor unipersonal, sino que se da el escenario de intervención de un curso determinado exterior o ajeno a la manifestación de voluntad del deudor. Por consiguiente, la obligación condicional presente en el con-trato de transacción del caso de autos es simplemente po-testativa y supera la prohibición del Artículo 1068 del Có-digo Civil.
Dicho lo anterior, pasemos a evaluar la disposición del Código Civil concerniente a las cláusulas condicionales po-testativas que aplica a la situación de hechos ante nosotros y que, a su vez, nos ilustra sobre el remedio en derecho que este Tribunal debe otorgar, si alguno.
Ante la pregunta de qué ocurre si la condición contraída no se cumple (conditio deficit), tenemos a nuestra disposi- *82 ción dos respuestas. Primero, si no hubo culpa, negligencia o dolo de las partes, “entonces ocurre una especie de reso-lución de la obligación y ésta entonces desaparece”. Vélez Torres, op. cit., pág. 140. Véase, también, Jarra Corp. v. Axxis Corp., supra, pág. 773. Segundo, si hubo culpa, ne-gligencia o dolo de la parte obligada, debemos acudir al Artículo 1072 del Código Civil, 31 L.P.R.A. sec. 3047 (“Se tendrá por cumplida la condición cuando el obligado impi-diese voluntariamente su cumplimiento”).(9)
Si ocurriera el primer supuesto y desaparece la obliga-ción, tratándose el caso de autos de un contrato de transacción, se da por no suscrito dicho acuerdo transaccional y se revive el pleito anterior. Tal escenario ocurrió en Bravman, González v. Consejo Titulares, 183 D.P.R. 827, 836 (2011) (“La estipulación fue acogida por el Tribunal de Primera Instancia mediante una sentencia... Sin embargo, poste-riormente fue dejada sin efecto debido a que no fue ratifi-cada en la asamblea correspondiente, convocada por el con-sejo de titulares”).
En cuanto al segundo escenario, el motivo detrás del *83 citado Artículo 1072 lo expresamos en Jarra Corp. v. Axxis Corp., supra, pág. 777, al sostener que “las partes sujetas a una obligación con condición suspensiva tienen que reali-zar esfuerzos de buena fe suficientes para cumplir sus prestaciones. Si no lo hacen, no pueden invocar la falta de ocurrencia de la condición como defensa para desligarse de su obligación”. De ocurrir éste, se daría por cumplida la condición de presentar a la Junta las estipulaciones rela-cionadas al arrendamiento y se daría por aprobado lo con-venido en el acuerdo transaccional. La consecuencia sería que las partes tendrían que perfeccionar un contrato de arrendamiento que debería contener, como mínimo, las es-tipulaciones suscritas en la transacción de diciembre de 1999. Examinemos cuál de los dos escenarios se dio en el caso de epígrafe.
C
Tal como expusimos previamente, según el palio de la relación contractual producto de la transacción, surgen dos condiciones suspensivas: (1) que se perfeccione un contrato de arrendamiento, y (2) que se presente a la Junta la oferta de PRFS, según recogida en el acuerdo transaccional de diciembre de 1999. Examinemos cada una por separado.
Tras examinar detenidamente los hechos que dieron pie a esta controversia, notamos que la segunda condición sus-pensiva se consumó. Entiéndase, la alta gerencia de la CCE presentó ante la Junta de Directores la oferta que presentó PRFS y la evaluó dentro de sus prerrogativas de aceptarla o rechazarla. Según consta en la minuta de la reunión de 24 de mayo de 2001, la Junta rechazó dicha oferta e hizo la correspondiente contraoferta. Véase Apén-dice, págs. 563-569.
La primera condición suspensiva, a la que estaba atada la efectividad del acuerdo transaccional, no se cumplió. A saber, no se perfeccionó el contrato de arrendamiento por-
*84 que la Junta válidamente rechazó la oferta de PRFS e hizo la propia, que también fue rechazada por la parte aquí recurrida. Ahora bien, como esbozamos previamente, el no cumplimiento de una condición puede ocurrir mediando dolo, culpa o negligencia de una de las partes, o sin mediar éstos. Del expediente se deduce que aquí no medió culpa o negligencia de la Junta de la CCE, puesto que ésta tenía la libertad de aceptar o rechazar la oferta realizada por PRFS y no hay evidencia de que hubo dolo o fraude al no aceptarla. Concluir lo contrario sería incidir perniciosa-mente sobre las prerrogativas de una parte contratante en el curso de aceptación de una oferta, lo que afectaría el tráfico jurídico y la libertad de contratación. Colón v. Gla-mourous Nails, supra, págs. 57-58.
Al no mediar dolo, culpa o negligencia de la parte peti-cionaria para que se cumpliera la condición de perfeccionar un contrato de arrendamiento, pues sencillamente “se extingue y desaparece el vínculo entre las partes” (Jarra Corp. v. Axxis Corp., supra, pág. 773), ocurre lo que Vélez Torres llama “una especie de resolución de la obliga-ción...”. Vélez Torres, op. cit., pág. 140. En tal contexto, se da por no suscrito el acuerdo de transacción y se revive el pleito anterior entre PRFS y la CCE.(10)
I — i HH
A base de la discusión anterior es evidente la necesidad de aplicar las disposiciones correspondientes del Código Civil en lugar de la doctrina de culpa in contrahendo, máxime cuando esa figura no se debe aplicar a una contro-versia si los hechos no la justifican. Con esa conclusión resolvemos un aspecto importante del caso de autos, mas *85 dejamos sin atender qué procede con relación a las deter-minaciones de hecho que hiciera el foro de instancia en cuanto a que ambas partes incurrieron en gastos económi-cos como parte de la relación comercial.
El Tribunal de Primera Instancia determinó que la CCE incurrió en gastos de infraestructura ascendentes a $254,519.96 para adecuar el Edificio #15 a las necesidades económicas de PRFS. Asimismo, ese foro dio por probado que la recurrida invirtió $218,481 entre mejoras internas al Edificio #15 y otros gastos de adiestramiento a su personal, todos relacionados al arrendamiento del edificio en cuestión. Ambas partes invirtieron esas cantidades de dinero previo a que se cumpliera la condición de que la Junta de la CCE aprobara la oferta de arrendamiento que realizó PRFS. La negligencia de ambas es evidente en tanto se deduce del expediente que las partes actuaron con pleno conocimiento de ese dato.
En términos jurídicos, la recurrida realizó mejoras so-bre propiedad inmueble ajena, mientras que la CCE per-mitió y autorizó expresamente las mejoras realizadas. Ante tal escenario, debemos auscultar la aplicabilidad de las disposiciones del Código Civil en cuanto a lo que los tratadistas llaman accesión continua industrial en bienes inmuebles. Véase Q.M. Scaevola, Código Civil, 5ta ed., Madrid, Ed. Reus, 1949, T. VI, pág. 578.
A
La accesión se define como “el derecho en virtud del cual el propietario de una cosa hace suyo todo lo que ésta produce o se le une o incorpora”. J.R. Vélez Torres, Curso de derecho civil: los bienes, los derechos reales, Madrid, Offirgraf, 1983, T. II, pág. 85. La accesión, como hecho físico, es un cambio, mutación, producción, adquisición, aumento o incremento en una cosa. Véase A. Carrasco Perera, “Ius aedificandi” y accesión: la construcción en suelo ajeno en el *86 marco de los principios urbanísticos, Madrid, Ed. Monte-corvo, 1986, págs. 59-60. La accesión puede clasificarse en continua (por incorporación) o discreta (por producción). Elfrén Bemier las define de la manera siguiente:
La accesión discreta es la de las cosas que nacen o se producen en las cosas que ya se poseen, es decir, se refiere a los frutos y productos de los bienes. La accesión continua se realiza cuando bienes extraños o ajenos a la cosa que se posee se unen o agregan a ésta. R. Elfrén Bernier, El derecho de accesión en Puerto Rico: el abogado y su cliente, Barcelona, Imprenta Vda. de Daniel Cochs, 1970, pág. 43.
La accesión continua se puede subdividir, a su vez, en (1) mobiliaria o inmobiliaria, según sea sobre un bien mueble o inmueble, y (2) natural o industrial, dependiendo de si la incorporación se debe a fuerza natural o a fuerza humana. Véase Vélez Torres, Curso de derecho civil, op. cit., pág. 88. La accesión continua se inspira en tres principios: “(a) la buena fe, (b) lo accesorio sigue a lo principal (accessorium sequitur principóle); y (c) el suelo es siempre cosa principal (superficies solo cedit)”. Id., pág. 92.
El Artículo 287 del Código Civil de Puerto Rico recoge de forma general el derecho de accesión y menciona que es inherente a toda propiedad, ya sea mueble o inmueble. 31 L.P.R.A. sec. 1131. Ahora bien, en cuanto a la accesión continua inmobiliaria industrial (aedificatio), el Código dispone particularmente de los Artículos 294 al 301 (31 L.P.R.A. secs. 1161-1168). Enfocaremos nuestro análisis en la accesión continua industrial sobre bienes inmuebles por ser la atinente a la controversia de autos.
El Artículo 294 del Código Civil estatuye que “ [1] o edifi-cado, plantado o sembrado en predios ajenos y las mejoras o reparaciones hechas en ellos, pertenecen al dueño de los mismos, con sujeción a lo que se dispone en [los artículos] siguientes”. (Enfasis suplido). 31 L.P.R.A. sec. 1161. La norma general es que las obras, plantaciones, siembras, mejoras y reparaciones de las que habla el Artículo 294 se presumen hechas por el dueño del predio. Art. 295 del Có- *87 digo Civil, 31 L.P.R.A. sec. 1162. No obstante, cuando un tercero es quien realiza las obras, esa presunción se puede controvertir. Ante este último escenario, el Código Civil provee varios cursos a seguir, dependiendo de si el tercero actuó con buena fe o mala fe. Para ello tenemos que dirigirnos a los Artículos 297 y 298 del Código Civil, 31 L.P.R.A. secs. 1164-1165.
Así, y en lo relativo a la controversia de autos, el Art. 297 del Código Civil indica que
[e]l dueño del terreno en que se edificare de buena fe, tendrá derecho a hacer suya la obra, previo el pago al dueño de la obra del costo de los materiales y la mano de obra, o el costo de reproducción de la misma al momento en que el dueño del terreno ejercitare su derecho, deduciendo la depreciación, lo que resultare mayor, o a obligar al que fabricó a pagar el pre-cio del terreno. (Enfasis suplido). 31 L.P.R.A. sec. 1164.
Lo anterior se basa en el principio de superficies solo cedit, derivado del principio accessorium sequitur princi-póle, por el que el suelo es lo principal y lo edificado es lo accesorio. Laboy Roque v. Pérez y otros, 181 D.P.R. 718, 727 (2011) (donde se adopta la accesión a la inversa como ex-cepción al principio de superficies solo cedit en casos de construcciones extralimitadas). Véase, además, Collazo Vázquez v. Huertas Infante, 171 D.P.R. 84, 119-120 (2007) (Fiol Matta, J., Op. Concurrente).
Contrario a la situación anterior, de haber mediado mala fe de parte del edificante, “el dueño del terreno puede elegir entre hacer suyo lo edificado, plantado o sembrado, sin obligación de indemnizar, o exigir que su finca sea re-puesta al estado en que se hallaba, a costas del autor de la accesión”. Puig Brutau, op. cit., 4ta ed., 1994, T. III, Vol. 1. Véanse: Arts. 298-299 del Código Civil, 31 L.P.R.A. secs. 1165-1166.
De los artículos mencionados se puede observar que a pesar de que el Artículo 294 incluye las mejoras como parte del derecho de accesión, el Artículo 297 no las menciona. A pesar de ello, los estudiosos del tema y la jurisprudencia de *88 este Tribunal se han expresado a favor de la inclusión de las mejoras como parte de las obras de edificación.(11) En Sucn. Echegaray v. Esso Standard Oil Co. comentamos:
De acuerdo con las referidas disposiciones de nuestro Código Civil, la accesión no se limita a edificaciones de carácter sus-tancial y permanente tales como edificios, viviendas, rellenos, muros de contención y canales de riego, sino que se da con respecto de otras obras y mejoras, como las de alumbrado, ascensores y servicio de agua, hornos, depósitos y cobertizo; lavaderos, fuentes y abrevaderos... Es más, los citados comen-taristas aceptan que mejoras útiles “edificadas” en un inmue-ble, pero susceptibles de ser retiradas sin deterioro del suelo pueden ser objeto de accesión. (Citas omitidas). Sucn. Echegaray v. Esso Standard Oil Co., 87 D.P.R. 825, 831 (1963). Véase, además, Scaevola, op. cit., págs. 578-579 (donde argumenta que las modalidades de accesión que el Código regula —edifi-cación, plantación y siembra— incluyen también las mejoras).(12)
Para determinar si el curso jurídico a seguir ante una edificación en predio ajeno es la aplicación del Artículo 297 o los relativos a la mala fe, hay que auscultar la naturaleza de ambas actuaciones. A pesar de que el Código Civil de *89 fine poseedor de buena fe a quien posea un título sobre una propiedad o a quien ignore los vicios de ese título, 31 L.P.R.A. secs. 1146, 1424, 5271, esta definición no se ajusta al contexto de la accesión industrial. Más aún, no hay una definición expresa en el Código en cuanto a qué constituye la buena fe al edificar, plantar o sembrar en suelo ajeno. Véase Laboy Roque v. Pérez y otros, supra, pág. 740.
Ahora bien, esta Curia sí ha delimitado el alcance de ambos conceptos en el contexto de la edificación en suelo ajeno. Así, pues, hemos concluido que el obrante de mala fe es aquel que edifica una estructura en un predio sin auto-rización alguna del dueño y a sabiendas de que el terreno no le pertenece, mientras que el edificante de buena fe construye bajo la creencia fundada de que el terreno es suyo o mediante autorización del dueño. C.R.U.V. v. Román, 100 D.P.R. 318, 322-324 (1971); Sucn. Echegaray v. Esso Standard Oil Co., supra, pág. 829 (“Dicha gestión se realizó de buena fe pues los dueños de la propiedad... ha-bían dado permiso para llevar a cabo dicho trabajo”).(13) Sobre este asunto, Scaevola llega a la misma conclusión:
¿qué se entenderá por obrar de buena o de mala fe en quien edifica... sobre terreno ajeno?... Pensamos que el accesionante o accedente procederá de buena fe cuando se considere con derecho a edificar, plantar o sembrar en el terreno en que así lo efectúe, ya con apoyo en algún título, en alguna autoriza-ción mal interpretada,... en la tolerancia del dueño o entre otras causas del mismo tenor. Scaevola, op. cit., págs. 594-595.
Hay un tercer curso aplicable en casos de accesión continua industrial en bienes inmuebles. Se trata del escena-rio que recoge el Artículo 300 del Código Civil: cuando tanto el edificante como el dueño del predio actúan de mala *90 fe. En tal circunstancia, “los derechos de uno y otro serán los mismos que tendrían si hubieren procedido ambos de buena fe”. 31 L.P.R.A. sec. 1167. En dicho artículo se define la mala fe del dueño cuando “el hecho se hubiere ejecutado a su vista, ciencia o paciencia, sin oponerse”. Id. El con-texto que evoca este artículo es la neutralización o compen-sación de dos actuaciones de mala fe. Véase García v. García, 70 D.P.R. 949, 956 (1950) (citando a Manresa, Comentarios al Código Civil Español, 5ta ed., Madrid, Ed. Reus, 1920, T.III, pág. 223, expusimos: “ ‘quien se deja en-gañar a sabiendas no puede querellarse como hombre en-gañado’ ” y “ ‘la mala fe del uno extingue y neutraliza, en justa reciprocidad, la del otro’ ”).
Visto el marco teórico que antecede, pasemos a exami-nar la controversia de autos dentro de éste.
B
Según narramos anteriormente, en la controversia ante nosotros, PRFS realizó mejoras en los predios de la CCE. Del expediente surge que el recurrido llevó a cabo tales actos a sabiendas de que no poseía ningún título sobre dicho predio ni que la Junta de Directores de la CCE aún había avalado el contrato de transacción entre las partes. No obstante, de las determinaciones de hecho que hiciera el Tribunal de Primera Instancia se deduce que la gerencia de la corporación pública expresamente autorizó y avaló que PRFS realizara mejoras internas para adecuar el Edi-ficio #15 a sus necesidades comerciales.
Conforme al marco teórico esbozado, la actuación de PRFS no se debe catalogar de mala fe, puesto que la CCE autorizó a realizar dichas mejoras. Ergo, para disponer de la controversia debemos dirigirnos directamente a la disposición del Artículo 297 del Código Civil, 31 L.P.R.A. sec. 1164. Véase Berrocal v. Tribl. de Distrito, 76 D.P.R. 38, 51 (1954) (si la edificación fue hecha con autorización expresa *91 o implícita del dueño, se aplica el Artículo 297 del Código Civil, sobre la accesión). Aunque estamos convencidos so-bre la aplicación directa del Artículo 297 del Código, si se aplicara el Artículo 300, 31 L.P.R.A. sec. 1167, amparados en la teoría de que PRFS actuó de mala fe, como quiera llegaríamos a la misma conclusión; a saber, se aplicaría el Artículo 297 por cuanto la CCE actuó de mala fe al no oponerse ante las obras que realizó la recurrida.
Obsérvese que en García v. García, supra, aplicamos el Artículo 300 del Código Civil aun cuando el dueño del pre-dio consintió expresamente a que los edificantes hicieran “mejoras sustanciales” sobre dos estructuras existentes. Id. pág. 951.(14) No obstante, ahora preferimos adoptar la ten-dencia de la casuística posterior a los efectos de que la autorización expresa o actuación proactiva del dueño del predio releva la aplicación del Artículo 300 y dirige la con-troversia directamente a la aplicación del Artículo 297. Aunque un tanto textualista, acogemos la postura de dejar la aplicación del Artículo 300 a aquellas instancias en que el dueño del predio asume un rol pasivo de no oponerse a las obras realizadas.
Esa postura comulga el propósito del Artículo 300 del Código Civil con la expresión heredada de la Séptima Par-tida, Título XXXIV, Ley 25, que formula la actitud pasiva de “quien se deja engañar entendiéndolo, no se puede que-rellar como hombre engañado”. Scaevola, op. cit., págs. 592-593. Scaevola igual mostraría su conformidad con nuestra postura, por cuanto él entiende que “[e]l poseedor del predio, en realidad, no muestra su mala fe más que con manifestaciones pasivas de su voluntad-, él deja hacer, ve venir y no impide, hace la vista gorda...”. (Enfasis en el *92 original). íd., pág. 594.(15) Según lo anterior, no vacilamos en abandonar aquellas expresiones de García v. García y aplicar a la controversia de autos directamente el Artículo 297, debido a que la CCE fue proactiva en avalar y autori-zar las mejoras hechas por PRFS.
Llegado a este punto, conviene recapitular que el Artí-culo 297 concede a la CCE una de entre dos alternativas: (1) puede hacer suya la obra, previa la indemnización de-bida a PRFS, o (2) de no ejercitar ese derecho, puede obli-gar a PRFS a pagar el precio del terreno.
De ejercer el derecho de accesión y hacer suya la edifi-cación hecha por PRFS, la corporación pública deberá abo-nar al accedente sólo los gastos necesarios y útiles, conforme el Artículo 382 del Código Civil, 31 L.P.R.A. sec. 1468. Véanse: Collazo Vázquez v. Huertas Infante, supra, págs. 121-122 (Fiol Matta, J., Op. Concurrente); Vélez Torres, Curso de Derecho Civil, op. cit., págs. 102—103 (la aplicación de los Artículos 382 y 383 del Código Civil, 31 L.P.R.A. secs. 1468 y 1469, que se sitúa en el primer pá-rrafo del artículo 297, aplica por igual al segundo párrafo de este último artículo). Entiéndase gastos necesarios como los indispensables para la conservación de la cosa y los útiles como aquéllos que aumentan la capacidad de rendi-miento y valor de la cosa, sin que tengan el propósito de servir como ornato o embellecimiento. J. Castán Tobeñas, Derecho Civil español, común y foral, 7ma ed., Madrid, Ed. Reus, T. 1, págs. 621-622.
Por último, mientras la CCE no ejerza su derecho de opción por una de las dos alternativas que le confiere el Artículo 297 del Código, PRFS poseerá un derecho propie-tario sobre la edificación realizada, que constituye un de- *93 recho real. Berrocal v. Tribl. de Distrito, supra, págs. 60-61.
> hH
De acuerdo con todo lo discutido, la conclusión no puede ser otra que la no aplicación de la doctrina de culpa in contrahendo, sino del articulado pertinente del Código Civil. Mediante la aplicación de este último, la relación contractual entre las partes se extingue y desaparece.
En cuanto a las mejoras que hizo PRFS en el interior del Edificio #15, ésta tiene un derecho real sobre dichas obras al amparo del Artículo 297 del Código Civil. Por consi-guiente, la CCE deberá ejercer su derecho de accesión e indemnizar a PRFS por el costo de los materiales o el costo de reproducción cuando la CCE ejercite su derecho de ac-cesión, lo que resulte mayor, salvo que decida obligar a PRFS a pagar el precio del terreno.
Debido a que la determinación de hechos del foro de instancia sobre los gastos en los que incurrió PRFS ascen-dientes a $218,481 incluyen no sólo mejoras al interior del edificio, sino costos de adiestramiento a empleados y otros, procedería devolver el caso al Tribunal de Primera Instan-cia para que desglose los gastos de la recurrida entre los que constituyen obras de mejoras y los que no. Así, lo que se determine exclusivamente como gastos de mejoras al interior del Edificio #15 será la cuantía que eventualmente la CCE deberá indemnizar a PRFS en caso de ejercer su derecho de accesión.
Por último, disiento porque la conclusión jurídica y la disposición final a la que llega una mayoría de esta Curia se apartan diametralmente de lo analizado y esbozado en esta Opinión y no añaden claridad doctrinal a nuestro es-tado de Derecho Civil. Por todos los motivos que antece-den, revocaría al Tribunal de Apelaciones y devolvería la *94 controversia al Tribunal de Primera Instancia para que proceda conforme a lo aquí expuesto.
— O —
Opinión disidente emitida por el Juez Asociado Señor Es-trella Martínez.
Hoy, este Tribunal ha optado por una interpretación res-trictiva de la extensión de la compensación del interés ne-gativo en los casos de culpa in contrahendo. Respetuosa-mente disiento de este proceder. Por considerar que el principio de la buena fe en las negociaciones precontrac-tuales merece una protección íntegra, incluiría en la in-demnización por culpa in contrahendo el daño emergente, así como el lucro cesante resultante de las pérdidas de otras oportunidades de contratar.
HH
En nuestro ordenamiento se reconoce que las negocia-ciones preliminares generan una relación de carácter social que impone a las partes el deber de comportarse de acuerdo con la buena fe. Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517, 527 (1982). El principio de buena fe en las negociaciones es definido como “el deber en comportarse de forma leal y cooperadora frente al otro sujeto de derecho con el que nos relacionamos, en forma que con nuestro comportamiento puedan realizarse las expectativas comu-nes que mutuamente nos hemos trazado”. M.J. Godreau, Lealtad y buena fe contractual, 58 (Núm. 3) Rev. Jur. U.P.R. 367, 382 (1989). Es por esto que la buena fe crea un deber de lealtad recíproca de conducta socialmente valorable y exigible. Prods. Tommy Muñiz v. COPAN, supra, pág. 528.
De acuerdo con este fundamento, en Prods. Tommy Mu-ñiz v. COPAN, supra, reconocimos que la terminación in- *95 justificada de los tratos preliminares genera responsabi-lidad. Determinamos en el mencionado caso que la amplia gama de supuestos sobre los cuales se puede basar la res-ponsabilidad precontractual hace necesario que en el aná-lisis del problema se considere qué figura jurídica responde más adecuadamente como fundamento jurídico para la so-lución del caso.
En cuanto a la extensión de la indemnización, en Prods. Tommy Muñiz v. COPAN, supra, el entonces Juez Asociado Señor Dávila emitió un voto separado en el cual consideró conveniente expresarse en cuanto a los daños que se de-bían resarcir en estos casos. Señaló que el daño al interés negativo debía ser reparable. A su juicio, éste comprendía no sólo los gastos realizados en previsión del futuro con-trato, sino, también, las pérdidas ocasionadas por desapro-vechar ocasiones favorables para celebrar un contrato con otras personas. Véase Prods. Tommy Muñiz v. COPAN, supra, voto separado del Juez Asociado Señor Dávila.
Posteriormente, en Colón v. Glamourous Nails, 167 D.P.R. 33 (2006), tuvimos ocasión para expresarnos acerca de la extensión de la indemnización que procedía en los casos de culpa in contrahendo. Al respecto, resolvimos que “el deber de indemnizar por el rompimiento culposo de los tratos preliminares alcanza, de ordinario, tan sólo el ‘inte-rés negativo’; es decir, la reparación de los gastos sufridos y las pérdidas patrimoniales derivadas del proceder arbitra-rio de la parte que incurre en culpa”. (Enfasis suplido). Id., pág. 58. Es decir, determinamos que la indemnización en estos casos se limita al interés negativo. A su vez, expresa-mos que los componentes del interés negativo son los gas-tos sufridos y las pérdidas patrimoniales derivadas del pro-ceder arbitrario. Los fundamentos que se consideraron para limitar el alcance de este tipo de indemnización fue-ron, principalmente, dos. El primero fue que la doctrina de culpa in contrahendo es considerada hija de la equidad y busca colocar al perjudicado como si no hubiesen ocurrido *96 las circunstancias que dan lugar a la reparación. El se-gundo, la fuerte política pública a favor del tráfico jurídico y la libertad de contratación. Id., págs. 56-58.
Aunque atendimos en parte la extensión que debía te-ner la reparación en los casos de culpa in contrahendo y determinamos que el interés negativo se compone de los gastos sufridos y las pérdidas patrimoniales derivadas del proceder arbitrario, no nos expresamos en cuanto a qué gastos y pérdidas debían incluirse dentro del llamado inte-rés negativo. Este Tribunal solamente estableció la impro-cedencia de la indemnización por daños morales en estos casos.
H-í I — 1
Una vez más este Tribunal es llamado a expresarse con relación a la extensión de la indemnización de quien se vio afectado por la actuación de la otra parte al ésta concluir injustificadamente los tratos preliminares, e incumplir sus deberes de lealtad y buena fe en el proceso de negociación. En específico, este Tribunal debe determinar si el lucro ce-sante debe resarcirse dentro del daño al interés negativo.
Como señala la Opinión mayoritaria, la doctrina está un tanto dividida en cuanto a la extensión de lo que es com-pensable en los casos de culpa in contrahendo. Esto, debido a que definir qué incluye el interés negativo ha sido motivo de debates. Pasemos a ver las diferentes definiciones y posturas.
La creación de la doctrina de culpa in contrahendo se le atribuye al jurista alemán Rudolf Von Ihering, quien en 1860 publicó una monografía relativa al tema de la respon-sabilidad civil que se origina en el periodo de la formación del consentimiento. Véase M.P. García Rubio, La responsabilidad precontractual en el Derecho español, Madrid, Ed. Tecnos, 1991, pág. 27. Al abordar el tema de la extensión del resarcimiento en estas situaciones, Ihering elaboró la *97 distinción entre el interés positivo y el interés negativo. El positivo tendría su fundamento en la validez del contrato, mientras que el negativo en su invalidez. íd., pág. 230. Según la teoría del interés negativo de Ihering, es este el daño que se debe resarcir en los casos de culpa in contra-hendo porque incluye, tanto los gastos realizados con miras a la conclusión del contrato como los daños derivados del rechazo de la pérdida de otros contratos posibles. íd.
La doctrina moderna ha ido redefiniendo estos conceptos. García Rubio, op. cit., pág. 231. Por ejemplo, el interés negativo ha sido definido como el daño que no se habría producido si el contrato se hubiese realizado. A. von Thur y E. Thilo, citados en García Rubio, op. cit., págs. 231-232. Así, el daño negativo comprende aquel daño que la parte experimentó por haber confiado honestamente en el proceso de negociación y la concreción del contrato. El interés positivo, en cambio, comprende todas las ventajas patrimoniales resultantes si el contrato se hubiere celebrado. M. Alonso Pérez, La responsabilidad precontractual, 47 (Núm. 485) Rev. Crít. Der. Inmob. 859, 905 (julioagosto 1971).
Según Mosset Iturraspe, el interés negativo, también llamado interés de confianza, consiste en el daño sufrido como consecuencia de haber creído en la conclusión del contrato; la pérdida sufrida por haber atendido una invita-ción a entrar en tratativas o una oferta. J. Mosset Iturraspe, Responsabilidad por daños: parte general, Buenos Aires, Ed. Ediar, 1982, T. I, pág. 159. “El resarcimiento tiende a restablecer el statu quo anterior a esos hechos”, íd. Por esta razón, el mencionado autor se adhiere sin re-servas a la postura que extiende el interés negativo que debe ser resarcible para abarcar las ganancias que pudie-ron obtener en un negocio dejado de lado. De esta forma, Mosset Iturraspe favorece la inclusión del lucro cesante, criterio que indica es predominante en la doctrina europea. íd.
*98 Por su parte, Alonso Pérez expresa que el interés nega-tivo incluye los gastos que se realizaron en previsión del futuro contrato, tales como viajes, informes periciales y asesoramientos. Alonso Pérez, supra, pág. 905. Pero tam-bién comprende las pérdidas ocasionadas por no aprove-char ocasiones favorables de celebrar un contrato con otras personas. íd. “[E]s preciso que se ocasione un perjuicio patrimonial, representado por los gastos realizados en aten-ción al contrato proyectado o por las pérdidas sufridas en cuanto que la actitud dolosa de la parte impidió a la otra, confiada en su honorabilidad, celebrar el negocio con otros proponentes”. Id., pág. 906.
De forma similar, García Rubio considera que el lucro cesante indemnizable abarca la pérdida de otras oportuni-dades de contratar con un tercero, así como las ventajas que ellas derivarían, lo que exige demostrar la existencia efectiva de esas otras oportunidades negociables. García Rubio, op. cit., pág. 233.
La doctrina italiana sigue la doctrina de Ihering en cuanto a la distinción entre el interés negativo y positivo. Limita la indemnización al interés negativo por el daño ocasionado como consecuencia de haber confiado en las ne-gociaciones precontractuales con independencia del naci-miento del acuerdo jurídico. J. Mendieta, La culpa in contrahendo: historia, evolución y estado actual de la cuestión, 10 (Núm. 2) Rev. E-Mercatoria 40, 49 (disponible en http://www.emercatoria.edu.co.). La corte italiana ha es-tablecido que el daño resarcible incluye la pérdida deri-vada de la confianza en la conclusión del contrato y la pér-dida de ganancias a consecuencia del quebranto de otras ocasiones contractuales. Id.; Alonso Pérez, supra, pág. 905.
Otra parte de la doctrina tiene una visión aún más am-plia y define el daño negativo como aquel que está com-puesto por todos los daños sufridos por el acreedor a causa de haber confiado en la vigencia de un contrato que no se concretó. Quienes siguen esta postura entienden que éste *99 comprende todos los daños en relación de causalidad ade-cuada, que ocasiona la frustración del acto en sentido amplio. Véase L. Cantarelli, Daño al interés negativo, Las tesinas de Belgrano, Núm. 152, pág. 20 (2004) (disponible en http:/ /www.ub.edu.ar/).
En Puerto Rico, el profesor José Julián Álvarez Gonzá-lez ha expresado su inclinación a favorecer la postura de Alonso Pérez en cuanto a la inclusión de otras pérdidas causadas por desaprovechar ocasiones favorables para ce-lebrar un contrato con otras personas. Véase J.J. Álvarez González, El Tribunal Supremo de Puerto Rico: análisis del término 2005-2006, Responsabilidad civil extracontractual, 76 (Núm. 3) Rev. Jur. U.P.R. 763, 786 (2007). Igual postura parece sostener el profesor Michael Godreau al se-ñalar que no logra ver la justificación para no proteger de una forma igualmente vigorosa a la víctima del comporta-miento negligente que a un negociante de buena fe, víc-tima del quebrantamiento de sus expectativas razonables de contratar. M.J. Godreau, El Tribunal Supremo de Puerto Rico: Análisis del Término 2005-2006, Obligaciones y Contratos, 76 (Núm. 3) Rev. Jur. U.P.R. 901, 902-903 (2007).
En contraposición a las posturas que admiten el doble componente de la indemnización en la ruptura de las ne-gociaciones y las posturas aún más abarcadoras, se en-cuentran quienes rechazan la inclusión del lucro cesante en la indemnización por la ruptura de las negociaciones contraria a la buena fe. Según estos autores, cuando ocurre un retiro de las negociaciones se puede indemnizar sola-mente por los gastos realizados, no así por las ganancias dejadas de percibir.
Uno de los primeros en plantear esta visión fue Faggella. El jurista italiano rechazó el concepto de interés negativo. G. Faggella, Dei periodi precontracttuali e della loro vera ed esatta costruzione scientifica, 1906, T. III, pág. 341, citado en García Rubio, op. cit., pág. 32. En su lugar *100 propuso que el daño resarcible se compone del valor de la oferta con relación a la formación del contrato y por los daños y gastos que hubiese incurrido durante los tratos. Id. En estos gastos no incluye la reparación de las ocasiones perdidas. íd. De manera similar, Moreno Quesada consi-dera que sólo deben ser indemnizables los gastos efectua-dos con miras a la concreción del contrato. B. Moreno Quesada, La oferta de contrato: génesis del contrato y responsabilidad antecontractual, Barcelona, Ed. Nereo, 1963, pág. 56.
Entre quienes defendían la no inclusión del lucro ce-sante en la cuantía de indemnización por culpa in contra-hendo se encontraba Diez Picazo. Sin embargo, este autor al parecer ha modificado su postura recientemente. Ha afirmado que el interés negativo incluye, también, el lucro cesante o la ventaja que la parte perjudicada hubiera po-dido obtener si como consecuencia de la negociación em-prendida hubiera perdido otra ocasión de contratar. Véase L. Diez-Picazo, La existencia del contrato, AAMN, Núm. 39., pág. 190 (2009), citado en M.P. García Rubio, Estudio doctrinal: la responsabilidad precontractual en la propuesta de modernización del derecho de obligaciones y contratos. LXV Boletín del Ministerio de Justicia Núm. 2130 (2011) (disponible en www.mjusticia.es/bmj).
Como vemos, la postura de no inclusión del lucro ce-sante o la ventaja de oportunidades de contratar con terce-ros, al parecer, es minoritaria(1) Según García Rubio, esta división en cuanto a computar como elementos del interés negativo, tanto los gastos efectuados inútilmente como la frustración de ganancias futuras no es marcada en la doc-trina extranjera, por lo cual le sorprende que algunos au-tores en la doctrina española excluyan como partida del interés negativo la falta de ganancia. García Rubio, La res- *101 ponsabilidad precontractual en el Derecho español, op. cit., pág. 232.
1 — I HH I — I
La mayoría de este Tribunal ha optado por la interpre-tación acotada de la extensión de los daños al interés negativo. Con esta determinación se limita la protección que debe perseguir el principio de buena fe durante las negociaciones. Considero que una interpretación estricta y estrecha no logra el objetivo de proteger el principio de la buena fe. Tal como expresamos en Colón v. Glamourous Nails, supra, pág. 45, a lo que debemos aspirar es a conse-guir que el desarrollo de las relaciones jurídicas, el ejerci-cio de los derechos y el cumplimiento de las obligaciones se produzcan conforme a una serie de principios que la con-ciencia jurídica considera necesario.
En materia de indemnización, el Art. 1059 de nuestro Código Civil, 31 L.P.R.A. sec. 3023, establece que la indem-nización de daños y peijuicios comprende no sólo el valor de la pérdida que haya sufrido, sino también el de la ga-nancia dejada de obtener. Este artículo le aplica, tanto a relaciones extracontractuales como a las contractuales. Claramente, el mencionado articulado reconoce que la in-demnización comprende el daño emergente y el lucro cesante.
Como mencionamos, la responsabilidad que surge por la culpa in contrahendo no incluye todos los daños contrac-tuales sufridos por la otra parte, sino sólo los peijuicios englobados en el llamado interés negativo. Colón v. Glamourous Nails, supra; Alonso Pérez, supra, pág. 905. La naturaleza reparativa está basada en el principio de que quien vulnera la confianza depositada por otro debe devol-ver a esa persona al estado que hubiera estado si no se hubieran dado las circunstancias que dan lugar a la reparación. Colón v. Glamourous Nails, supra, pág. 57.
*102 Los dos fundamentos principales para delimitar la in-demnización en los casos de culpa in contrahendo son que ésta proviene de la equidad, cuyo propósito es sancionar el quebrantamiento de la confianza, y que se busca proteger la libertad de contratación. Estos principios fueron claves para decidir circunscribir la compensación solamente al llamado interés negativo. Pero, debemos preguntarnos si estas razones son suficientes para no reconocer en la ex-tensión del interés negativo una cuantía por lucro cesante, ocasionado por las pérdidas patrimoniales consecuentes del quebranto de otras ocasiones de contratar que la parte perjudicada hubiera podido obtener.
La equidad exige que la buena fe sea protegida frente a la conducta culpable que puede causar una consecuencia dañosa. Véase Moreno Quesada, op. cit., pág. 200. En Colón v. Glamourous Nails, supra, expresamos que como hija de la equidad, la doctrina de culpa in contrahendo persigue sancionar el quebrantamiento de la confianza y regresar a las partes a la situación en la que se encontraban antes de comenzar los tratos fallidos. Quien sufrió un daño a su patrimonio como consecuencia de una violación al principio de la buena fe contractual de quien incurrió en culpa in contrahendo debe tener una protección completa. Existen unos efectos patrimoniales que no están circunscritos a un desembolso de efectivo. Por esta razón, para cumplir con el principio de equidad y sancionar ese quebrantamiento de la confianza, no basta con indemnizar solamente los gastos. También debe resarcirse el lucro cesante. De esta manera, la indemnización se debe extender a las oportuni-dades perdidas como consecuencia de las expectativas creadas. De igual forma, deben resarcirse las pérdidas oca-sionadas por situaciones en las que se llegan a ciertas ne-gociaciones y ofertas que no se pueden concretar por el retiro injustificado de las negociaciones de la otra parte. No reparar las pérdidas patrimoniales surgidas por el que-brantamiento de la buena fe en los tratos preliminares con- *103 vierte en incompleta la indemnización, lo que resulta en no colocar al perjudicado en la situación anterior. Para lograr el mencionado propósito de la equidad —sancionar el que-brantamiento de la confianza— es imperativo conceder una indemnización íntegra al peijudicado.
El otro fundamento para el alcance limitado de la in-demnización en estos casos es el principio de no coartar la libertad de contratación ni el tráfico jurídico. Sin embargo, el propio reconocimiento de la responsabilidad por culpa in contrahendo delimita ese principio. Es sabido que la liber-tad de romper las negociaciones no es absoluta. Precisa-mente, el límite reside en la confianza depositada por la otra parte en la conclusión del contrato y el principio de la buena fe durante las negociaciones. Aunque nadie está obligado a contratar en esta etapa, sí existe una obligación de comportarse según los principios de buena fe y violarlos conlleva la obligación de reparar el daño causado. Incluir el lucro cesante en la cuantía que puede ser indemnizada en los casos de culpa in contrahendo no elimina la libertad de contratación. Por el contrario, reitera la obligación de las partes de comportarse según los principios de buena fe. Como vemos, los fundamentos mencionados no son sufi-cientes para no reconocer una reparación real e íntegra a quien, confiando en la concreción del contrato, debido a las expectativas creadas por la otra parte, incurre en una serie de gastos y pérdidas patrimoniales.
Además de estos dos fundamentos principales mencio-nados en nuestra jurisprudencia, otra de las razones utili-zadas para sustentar la teoría de no inclusión del lucro cesante en la indemnización por culpa in contrahendo es la dificultad que representa probar la determinación del lucro cesante. La Opinión mayoritaria menciona que la partida de lucro cesante resulta improcedente cuando ésta es espe-culativa o no se puede demostrar su correlación con el acto dañoso. Sin embargo, cuando mediante prueba se demues-tra la pérdida patrimonial ocasionada por el retiro injusti- *104 ficado de las negociaciones, la partida no es especulativa y mucho menos improcedente.
Es sabida la dificultad que encierra la determinación de la cuantía de lucro cesante. Y es que, de ordinario, cuando el daño consiste en una disminución de patrimonio, la prueba de certeza no suele ser complicada. Mendieta, supra, pág. 52. Sin embargo, cuando se quiere demostrar la pérdida de un ingreso futuro, la prueba del daño resulta más compleja. Id. Es por esto que la determinación de la cuantía de lucro cesante es descrita como una operación intelectual en la que se contienen juicios de valor y que, de ordinario, exige la reconstrucción hipotética de lo que podría haber ocurrido. L. Diez-Picazo, Derecho de daños, Madrid, Civitas Ediciones, S.L., 1999, pág. 323. Sin embargo, el que existan dificultades probatorias para demostrar su existencia real no debe ser óbice para limitar la extensión de la indemnización que debe reconocerse en casos de culpa in contrahendo, esto debido a que la dificultad pro-batoria es común a la prueba de todos los lucros cesantes. García Rubio, Estudio doctrinal, supra.
Alonso Pérez reconoce lo complejo que en ocasiones puede resultar la determinación de la extensión objetiva del resarcimiento. Sin embargo, señala que debe determi-narse la indemnización de acuerdo a “las circunstancias delimitantes de cada supuesto concreto, el tipo de negocio que se preparaba y los gastos reales desembolsados”. Alon-so Pérez, supra, pág. 906. La dificultad probatoria no jus-tifica que tales lucros deban excluirse como partida a resarcir. Así, el quebranto patrimonial sufrido por el perju-dicado se debe resarcir brindando la indemnización, tanto del daño emergente como del lucro cesante incluido, por las pérdidas de otras oportunidades de contratar que se ven frustradas.
La dificultad en la determinación del lucro cesante reside en que sólo deben incluirse en este concepto los bene-ficios ciertos, concretos y acreditados que el perjudicado *105 debía haber percibido y no ha sido así. P.J. Femenía López, Criterios de delimitación del lucro cesante extracontractual, Valencia, Ed. Tirant lo Blanch, 2010, pág. 40. Es por esto que solamente podrán ser compensados los daños patrimoniales que dependan del mismo hecho y que sean un efecto de éstos. Al cumplir con este principio, el daño no es especulativo.
El límite de la cuantía a ser indemnizada por la que debe responder la persona que se retiró de las negociacio-nes y violentó así el deber de culpa in contrahendo debería ser determinado de acuerdo con la relación de causalidad. García Rubio, La responsabilidad precontractual en el Derecho español, op. cit., pág. 241. “La delimitación de lo que debe incluir el interés negativo no debe ser absoluta, sino más bien relativa. Le corresponde al demandante probar la extensión de su daño y la certeza de éste, así como la rela-ción de causalidad entre el hecho dañino y sus daños”. Mendieta, supra, pág. 70. De esta manera, para poder re-parar el daño se debe probar una relación de causalidad entre el daño y la actuación culposa o negligente.
La Opinión mayoritaria señala que quien usa un dere-cho a nadie ofende. Opinión mayoritaria, pág. 70. Sin embargo, tal como expusimos en Colón v. Glamourous Nails, supra, reconocimos que el ejercicio de un derecho no está exento de responsabilidad si se ejercita abusivamente. Es por esto que cuando se incurre en culpa in contrahendo existe una responsabilidad. No es correcto expresar que en la etapa precontractual no existe ningún género de responsabilidad. La responsabilidad de comportarse con-forme a los principios de buena fe y lealtad fue reconocida desde Prods. Tommy Muñiz v. COPAN, supra, según discutimos.
Por otra parte, el que la norma de culpa in contrahendo se aplique restrictivamente no es sinónimo de que la in-demnización que se reconozca, una vez aplicada la culpa in contrahendo a unos hechos en particular, se deba restrin- *106 gir a un tipo de indemnización. La determinación del re-sarcimiento debe alcanzar el interés negativo, como hemos resuelto, el cual comprende tanto el daño emergente como el lucro cesante, siempre sujeto al elemento de causalidad y a la prueba presentada.
Si reconocemos, como lo hemos hecho en el pasado, que en el curso de las negociaciones existe un deber de lealtad y éste no se cumple, debe resarcirse al demandante. Sin embargo, es importante aclarar que la postura que reco-noce el doble componente en esta indemnización no iguala la indemnización obtenida de la celebración y posterior cumplimiento del contrato. No se trata de equipararlo a los casos de incumplimiento propiamente contractual, sino de establecer la norma y ver caso a caso que se cumplan, como mencionamos, los criterios de causalidad adecuada.
I — i <J
A. Al determinar la extensión de la indemnización del interés negativo no debemos limitarnos a atender los gas-tos en que se incurrió para cumplir con el contrato que se estaba negociando. Luego de haberse creado unas expecta-tivas, podrían existir unas pérdidas patrimoniales que no están incluidas en un gasto incurrido. Por esta razón, es importante no limitar la indemnización a los gastos en los que se haya incurrido por el contrato que se esperaba realizar. En cambio, se debería poder incluir en la indem-nización las pérdidas de otras oportunidades de contratar con terceros. En cuanto a esta indemnización, García Ru-bio sostiene que el negociador, a quien se le ofreció otra oportunidad de contratar, puede, efectivamente, romper las negociaciones, pero puede también no hacerlo. Si opta por esto último, no ve razón por la cual tenga que sufrir las consecuencias negativas de la ilegítima actuación de su conegociante. García Rubio, La responsabilidad precontractual en el Derecho español, op. cit., pág. 235. Es por *107 esto que no lo ve como un riesgo de negocios que debe asumir. Id.
En la etapa de negociación se pueden considerar varios factores para que un negociante pierda ofertas más favorables. Los criterios que se consideran para determi-nar si ha mediado culpa en la terminación de los tratos preliminares sirven de norte para comprender las razones por las que una persona pueda optar por continuar en las negociaciones, aunque así pierda otras oportunidades de contratar. El desarrollo de las negociaciones, los hechos particulares y la relación que se ha venido dando, el curso que siguieron las mismas, la conducta de las partes en ese transcurso, la etapa avanzada de las negociaciones, los gastos en que se incurrió por el contrato que se esperaba realizar, la expectativa razonable de la conclusión del con-trato, son consideraciones que demuestran las razones por las cuales una parte puede optar por mantenerse en las negociaciones y afectar así las oportunidades que tenga con otros. García Rubio también señala que puede querer continuar debido a la confianza especial que suscita. García Rubio, La responsabilidad precontractual en el Derecho español, op. cit., pág. 241. Si el negocio proyectado no llega a celebrarse, “la persona defraudada sufre un daño que será tanto mayor cuanto peores sean las condiciones en las que pueda realizar un contrato semejante al frustrado ...”. íd.
De igual forma, existen situaciones en las que una parte realiza- ciertas negociaciones con miras concretar el con-trato que se estaba negociando, pero la otra parte que-branta estos procesos afectando así la buena fe y lealtad depositada por el otro. El daño ocasionado por estas nego-ciaciones frustradas debería ser indemnizado. Son situa-ciones que no están incluidas en los gastos en los que se incurrió propiamente, pero que crean una pérdida patrimonial que debería ser atendida de acuerdo con la protección de la buena fe en los tratos prelimináres. En síntesis, la *108 reparación en casos de culpa in contrahendo debería in-cluir, tanto los gastos inútiles efectuados durante las nego-ciaciones así como también la pérdida de oportunidades para negociar a causa del contrato no concluido. Por lo tanto, la reparación comprendería, tanto el daño emer-gente como también, de haberlo, el lucro cesante.
Por los fundamentos expresados y por entender que la interpretación limitada en cuanto a la indemnización en casos de culpa in contrahendo por la que ha optado la opi-nión mayoritaria va en detrimento del principio reconocido y de su protección, disiento de la decisión de la mayoría.
B. En el caso ante nuestra consideración, surge del ex-pediente que se presentó prueba testifical y documental que demostró que los recurridos incurrieron en gastos como consecuencia de la expectativa que tenían respecto al contrato de arrendamiento. Para establecer estos daños, los recurridos presentaron un informe de daños y un esti-mado de pérdidas preparados por un perito. Apéndice, pág. 2110. En este informe se incluyó la cantidad de gastos in-curridos relativa al contrato que iba a realizarse. Entre los gastos incurridos se demostraron gastos en contratación de arquitectos, preparación de un manual, compra de progra-mas de computadoras, y gastos de adiestramientos y viajes para los mismos, entre otros. De igual forma, se establecie-ron las pérdidas de otras oportunidades para contratar. Debido al contrato que se realizaría, los recurridos llevaron a cabo negociaciones para otros contratos porque tenían un plan de ampliación. Estas negociaciones tenían como pro-pósito formalizar el contrato que se estaba negociando para el arrendamiento del edificio 15, pero no culminó el proceso porque no se realizó el contrato. De esta manera, la otra parte quebrantó estos procesos y se afectó la buena fe y lealtad depositada por Puerto Rico Freight System (PRFS).
En el informe, el perito utilizó dos clientes existentes para realizar los cómputos de la expectativa de ganancia. *109 Apéndice, pág. 1764. El recurrido presentó suficiente prueba documental, testifical y pericial que convenció a los foros de su procedencia. Como vemos, la prueba del recu-rrido sobre los costos y gastos en los que se incurrió resultó convincente.
Como es sabido, la apreciación de la prueba del foro pri-mario merece gran deferencia. En ausencia de pasión, pre-juicio, error manifiesto o parcialidad, los foros apelativos no deben intervenir con las determinaciones de hecho y la apreciación de la prueba que realiza un tribunal de instancia. Colón v. Lotería, 167 D.P.R. 625, 659 (2006); Lugo v. Municipio Guayama, 163 D.P.R. 208, 221 (2004); Argüello v. Argüello, 155 D.P.R. 62, 78-79 (2001).
V
Por todo lo antes expuesto, respetuosamente disiento del criterio mayoritario. En su lugar, reconocería la proce-dencia del lucro cesante dentro de la partida del interés negativo que procede ser compensado en los casos de culpa in contrahendo. Por consiguiente, confirmaría el dictamen del Tribunal de Apelaciones.

 Berrocal v. Tribl. de Distrito, 76 D.P.R. 38, 51 (1954) (Belaval, J., Op. Mayoritaria).

 Anteriormente tuvo otros nombres, como el del epígrafe, pero nos referiremos a ésta bajo el nombre actual: Compañía de Comercio y Exportación de Puerto Rico (CCE).

 “La parte demandada autorizó órdenes de cambio y las pagó ascendentes a $254,519.96 conforme a los señalamientos que hiciera PRFS a la infraestructura del Edificio #15 para su uso particular. (Exhibit 4 estipulado por las partes)”. Sentencia Tribunal de Primera Instancia, Apéndice, pág. 797.

 El Tribunal de Primera Instancia sentenció que dichos gastos, que incluyen adiestramientos a empleados de Puerto Rico Freight System (PRFS), ascendieron a $218,481.00. íd., págs. 814-815.

 Por parte de la gerencia de la CCE, su autoexpectativa de que se aprobara el contrato de arrendamiento llegó al punto de aceptar las peticiones de cambios es-tructurales que le hizo PRFS. Además, el Sr. César Santoni, en representación de la CCE, envió una carta a un futuro cliente de PRFS en la cual indicó que PRFS había demostrado el profesionalismo y la responsabilidad fiscal necesaria para que la CCE le permitiera utilizar las nuevas instalaciones del Edificio #15, con 94,000p2 dentro de la Zona Libre. Apéndice, pág. 1009.
Por parte de PRFS, su autoexpectativa especulativa se reflejó mediante el tes-timonio de Miguel Padilla, presidente de PRFS, quien indicó que era costumbre que se mudaran a las instalaciones de la CCE sin todavía haber perfeccionado un contrato. Transcripción de la Vista en su Fondo, Apéndice, pág. 1139. Éste también declaró: “El [director ejecutivo de la CCE] me indicó que lo que yo estaba solicitando tenía su aprobación, que él no veía ningún problema; era simplemente esperar la burocracia de sometérselo a la Junta y pasar por todos los procesos normales de Promo-Export”. Íd., pág. 1259.

 De la transcripción de la vista en su fondo se deduce que el contrato de arrendamiento para el Edificio #11, firmado el 22 de diciembre de 1999, tenía vigen-cia de cinco años a un precio de $6.00p2 por los primeros dos años y $6.50p2 por los siguientes tres años, cifras no muy lejanas a la contraoferta que hizo la Junta en su reunión de 24 de mayo de 2001.

 Cabe señalar que el Artículo 1074 del Código Civil provee una acción al acreedor previo a ocurrir la condición. Dicho Artículo expresa: “El acreedor puede, antes del cumplimiento de las condiciones, ejercitar las acciones procedentes para la conservación de su derecho”. 31 L.P.R.A. see. 3049. Queda claro que el acreedor en este caso (PRFS) no podía exigir el cumplimiento de la condición, pero sí podía ejer-cer acciones para conservar su derecho. Véase Mercedes Bus Line v. Rojas, 70 D.P.R. 540, 548 (1949).

 Vélez Torres define las condiciones simplemente potestativas como aquéllas en que interviene la realización de un hecho exterior a la voluntad de la parte. J.R. Vélez Torres, Derecho de obligaciones: curso de derecho civil, 2da ed. rev., San Juan, Programa de Educación Jurídica Continua, Universidad Interamericana, 1997, pág. 146.

 Para llegar a la conclusión de aplicar el Artículo 1072 del Código Civil, 31 L.P.R.A. sec. 3047, es imprescindible hacer una declaración de responsabilidad por dolo, culpa o negligencia por la parte obligada al cumplimiento de la condición. Como norma general, en una controversia contractual hay que evaluar si la parte culpable o negligente debe resarcir los daños ocasionados durante la vigencia de la relación obligacional y para ello se debe considerar lo dispuesto en los Artículos 1054 al 1060 del Código Civil, 31 L.P.R.A. sees. 3018-3024. Sin embargo, y a modo de excepción, el propio Artículo 1072 del Código Civil ya incluye la penalidad que ha de pagar el deudor que voluntariamente impide el cumplimiento de la condición pactada. La doctrina civilista sostiene que la obligación que impone dicho artículo de dar por cumplida la condición constituye, en sí misma, la pena impuesta al deudor incum-plidor en concepto de daños y perjuicios. Sostienen Planiol y Ripert:
“[L]a condición no realizada se considera cumplida cuando el deudor, con hechos propios impidió su cumplimiento. Aun cuando los hechos del deudor estén exentos de fraude, causan al acreedor un perjuicio que debe repararse, y la más perfecta repa-ración que pueda ofrecerse al acreedor es el cumplimiento de la obligación, como si se hubiere realizado la condición”. M. Planiol y G. Ripert, Tratado elemental de derecho civil (J.M. Cajica trad.), 4ta ed., 2003, T. IV, págs. 261-262. Véase, además, J. Puig Brutau, Fundamentos de Derecho Civil, 3ra ed. rev., 1985, T. I, Vol. II, pág. 91.
Por consiguiente, si se demuestra que en la presente controversia la CCE come-tió culpa o negligencia que impidiera el cumplimiento de la condición, el remedio jurídico al que tuviese derecho PRFS lo dispone el citado Artículo 1072 del Código Civil, mas no habría que acudir a la doctrina de culpa in contráhendo.

 Reconocemos que revivir un pleito de hace más de diez años podría resultar oneroso, tanto para las partes como para el proceso judicial. Por ello no descartamos la idea de que ante tal escenario las partes decidan volver a reunirse para lograr una transacción que ponga fin a aquel pleito.

 Es imperativo que reconozcamos la distinción de mejoras para fines de la accesión, donde el edificante no tiene que ser poseedor (Q.M. Scaevola, Código Civil, 5ta ed., Madrid, Ed. Reus, 1949, T. VI, págs. 580-581), de las mejoras sin autoriza-ción dentro del contexto de un arrendamiento. En este último supuesto, donde el arrendatario sólo goza de la posesión natural, a las mejoras útiles o de recreo que éste haga les aplican los Artículos 1463 y 416 del Código Civil, 31 L.P.R.A. secs. 4070 y 1527. Véanse, además: Marchand v. Montes, 78 D.P.R. 131 (1955) (a un arrenda-tario que hace mejoras útiles o voluntarias sin consentimiento del arrendador no le aplican las disposiciones sobre accesión. Por lo tanto, sólo tiene disponible el ius tollendi: el derecho de llevarse los adornos incorporados, cuando sea posible hacerlo sin dañar la propiedad); Berrocal v. Tribl. de Distrito, supra; J.R. Vélez Torres, Curso de derecho civil: los bienes, los derechos reales, Madrid, Offirgraf, 1983, T. II, pág. 105.

 Elfrén Bernier también se ha expresado sobre el tema a los efectos de que
“[piara que se produzca la accesión no es necesario que el objeto situado en el inmueble haya adquirido el carácter de inmueble adhiriéndose a la propiedad de manera que no puede separarse de ella sin quebrantamiento o deterioro. La accesión no se limita a edificaciones de carácter sustancial y permanente tales como edificios, viviendas... sino que se da también con respecto a mejoras... Por lo tanto, aun las mejoras útiles que pueden ser retiradas sin menoscabo del inmueble pueden ser objeto de la accesión a elección del dueño del inmueble”. R. Elfrén Bernier, El derecho de accesión en Puerto Rico: el abogado y su cliente, Barcelona, Imprenta Vda. de Daniel Cochs, pág. 62.

 Si bien la buena fe se presume, 31 L.P.R.A. sec. 1425, en Lippitt v. Llanos, 47 D.P.R. 269 (1934), resolvimos que cuando se edifica en solar ajeno se destruye esa presunción y hay que probar la buena fe. De la jurisprudencia se deduce que, en casos como el de autos, se recupera la calificación de buena fe con la autorización del dueño del predio para realizar las mejoras.

 García v. García, 70 D.P.R. 949 (1950), fue revocado por Echegaray v. Tribl. de Distrito, 72 D.P.R. 445 (1951), pero sólo a los efectos de que para ejercitar el derecho de accesión ya no hay que indemnizar al edificante previo a la demanda ni consignar junto con ésta cantidad alguna por los costos de edificación. Echegaray, supra, pág. 449.

 Al referirse al Artículo 364 del Código Civil español, equivalente al Artículo 300 del nuestro (31 L.P.R.A. sec. 1167), Alberto Brenes Córdoba argumenta que la mala fe del dueño del predio debe entenderse como una autorización tácita o mali-ciosa complacencia para aprovecharse de lo ajeno. A. Brenes Córdoba, Tratado de los bienes, 5ta ed., San José, Ed. Juricentro, 1981, pág. 214.

 Véanse: J. Mosset Iturraspe, Responsabilidad por daños: parte general, Buenos Aires, Ed. Ediar, 1982, T. I, pág. 159; M.P. García Rubio, La responsabilidad precontractual en el Derecho español, Madrid, Ed. Tecnos, 1991, pág. 232.